Judge Madeleine M. Landrieu
| defendants: BAC # 2 Investments, LLC (“BAC #2”); Gene Langkop, individually, and doing business as Langkop Construction (collectively referred to as “Langkop”); and their insurer, Seneca Insurance Company (“Seneca”), suspensively appeal the trial court’s judgment finding them jointly liable for the wrongful death of Dan Gordon and awarding damages to Mr. Gordon’s two minor children. For the reasons that follow, we affirm.
FACTS AND PROCEEDINGS BELOW
Mr. Gordon was killed on April 21, 2012 when part of a segmented concrete wall collapsed on top of him while he was working as an independent contractor for BAC # 2. Mr. Gordon was working as a painter on the renovation of a warehouse that had recently been purchased by BAC# 2. Mr. Langkop was supervising the renovation project. At the time the accident occurred, Mr. Gordon was in an alley behind the warehouse. Mr. Langkop was also in the *433 alley, pressure-washing the back of the warehouse. The concrete wall, which was located on the other side of the alley on property owned by Baker Ready Mix, L.L.C. (“Baker”), partially collapsed into the alley. Approximately five years |2prior to this accident, Baker had constructed the wall at the back of its parking lot, which was used to park its concrete trucks.
After Mr. Gordon’s death, Katrina Horton, the mother of Mr. Gordon’s daughter, Kamri, and Tonya Winford, the mother of Mr. Gordon’s son, Donte, each brought a survival /wrongful death action on behalf of her child against numerous defendants, including BAC# 2, Langkop and Seneca. A third plaintiff, Michael Polk, also filed a wrongful death action alleging he was the adult son of Mr. Gordon, and all three actions were consolidated in the trial court. Multiple claims were either settled or dismissed during several years of pretrial proceedings. When the matter came to trial in 2015, the only remaining claims were the wrongful death claims on behalf of Kamri and Donte Gordon against BAC # 2, Langkop and Seneca.
Following a bench trial conducted April 27-30, 2015, the trial court on July 17, 2015, rendered a written judgment finding BAC # 2, Langkop, and Seneca (jointly) to be seventy-five percent (75%) at fault in causing the death of Mr. Gordon, and allocating the remaining twenty-five percent (25%) fault to Baker, a settling defendant.[1] The trial court awarded the following damages: (1) To Kamri Gordon, $350,000.00 for pain and suffering, and $32,819.69 for loss of financial support; (2) To Donte Gordon, $500,000.00 for pain and suffering, and $58,135.80 for loss of financial support, with each amount to be reduced by twenty-five percent (25%) to account for the percentage of fault attributed to Baker.
■BAC #2, Langkop and Seneca suspen-sively appeal this judgment.
JjJSSUES
On appeal, the appellants argue that the trial court erred by:
(1) Granting the plaintiffs’ motion to strike the jury;
(2) Misapplying the duty/risk analysis to find that BAC #2 and/or Langkop owed a duty to protect Mr. Gordon from the collapse of the wall; that BAC# 2 and/or Langkop breached that duty; and that the conduct of BAC# and/or Langkop caused the wall’s collapse;
(3) Allocating the majority of the fault to BAC #2 and Langkop rather than to Baker;
(4) Awarding excessive amounts of damages to the plaintiffs.
DISCUSSION
. I. Motion to Strike Jury
BAC # 2, Langkop and Seneca assign as error the trial court’s granting of the plaintiffs’ motion to strike the jury, which was based upon the defendants’ failure to timely post the jury deposit pursuant to Louisiana Code of Civil Procedure Article 1734. The defendants sought supervisory review of this ruling. On April 22, 2015, this court denied their writ application, rendering the following disposition:
SUPERVISORY WRIT DENIED.
Notwithstanding that the relators have failed to attach evidence to their writ application of the filing of a notice of intent as required by Rule 4-2 of the Uniform Rules of the Courts of Appeal (which is a grounds to deny the current application), we find no error in the trial court’s decision to strike the jury. La. *434 C.C.P. art. 1734.1 permits a party who did not request a jury to post the jury-deposit within ten days of the deadline established by the court to make the jury deposit; such party may not utilize the untimely payment of the jury deposit by l4a person who requested a jury to claim that they now want the jury. The writ application is denied.[2]
In their appellant brief, the defendants suggest that this court cannot revisit its decision on the issue of the motion to strike because our writ disposition is “law of the case.” Incorporating by reference the argument made in their writ application, the defendants aver that this issue is being raised by them solely to preserve it in the event this case is reviewed by the Louisiana Supreme Court. The plaintiffs agree that this court’s writ disposition is law of the case and urge us to affirm the trial court’s granting of the motion to strike on that basis alone.
As this court has repeatedly held, however, the “law of the case” principle does not apply to the denial of a writ application:
The trial court apparently read our denial of the writ application as an affirmation of its original decision.... However, a denial of a writ application is of no precedential value, regardless of the reasons assigned. That is, a writ denial is not precedential for any purpose; it is merely a statement that the court is declining to exercise its supervisory jurisdiction to review the issues addressed at that time. Lake Air Capital II, LLC v. Perera, 15-0037, p. 7 (La.App. 4 Cir. 5/13/15), 172 So.3d 84, 88; Diecidue v. Tittle, 12-0903, p. 3 n. 2 (La.App. 4 Cir. 8/14/13), 122 So.3d 1143, 1145; State v. Davis, 09-0438, p. 19 (La. App. 4 Cir. 1/13/10), 30 So.3d 201, 211; Arceneaux v. Amstar Corp., 06-1592, p. 20 (La. App. 4 Cir. [10/31/07),] 969 So.2d 755, 771; State v. Williams, 00-1725, p. 4 n. 3 (La. 11/28/01), 800 So.2d 790, 795; St. Tammany Manor, Inc. v. Spartan Building Corp., 509 So.2d 424, 428 (La. 1987). In general, the denial of supervisory writs does not bar a different conclusion or reconsideration of the same issue argued in the writ application when an appeal is taken from a final judgment. M; Levine v. First Nat. Bank of Commerce, 06-394, p. 6 n. 4 (La. 12/15/06), 948 So.2d 1051, 1056; East Baton Rouge Parish School Bd. v Wilson, 08-0536, p. 10 (La.App. 1 Cir. 6/6/08), 992 So.2d 537, 543; Diamond B Construction Co., Inc. v. Department of Transp. and Development, 02-0573, p. 7 (La.App. 1 Cir. 2/14/03), 845 So.2d 429, 434.
Nabors Offshore Corp. v. Caterpillar Inc., 2016-0003, p. 5 (La.App. 4 Cir. 11/30/16), 204 So.3d 1068 (emphasis added).
Therefore, despite the parties’ assertions, this court’s writ disposition does not preclude us from addressing the merits of the trial court’s granting of the plaintiffs’ motion to strike the jury.
Addressing this issue on appeal, we conclude that the trial court did not err by granting the motion. Louisiana Code of Civil Procedure article 1733 provides that “[a] party may obtain a trial by jury by filing a pleading demanding a trial by jury and a bond in the amount and within the time set by the court....” Article 1734.1 further provides, in pertinent part:
*435 When the case has been set for trial, the court may order, in lieu of the bond required in Article 1734, a deposit for costs, which shall be a specific cash amount, and the court shall fix the time for making the deposit, which shall be no later than thirty days prior to trial.... Notice of the fixing of the deposit shall be served on all parties. If the deposit is not timely made, any other party shall have an additional ten days to make the required deposit. Failure to post the cash deposit shall constitute a waiver of a trial by jury.
In the instant case, multiple defendants filed answers that requested a trial by jury, including Baker, Travelers Insurance Company (“Travelers”), the insurer of Baker, and Seneca, the insurer of BAC# 2 and Langkop. Neither BAC# 2 nor Lang-kop requested a jury, however. The trial court issued a Jury Deposit Order pursuant to Article 1734.1 requiring that “the party requesting trial by jury” deposit a certain amount with the clerk of the district court no later than thirty days prior to the April 20, 2015 trial date. No party made the requisite deposit by this deadline, which was March 21, 2015. Within ten days of that date, on March 30, 2015, counsel for BAC# 2 and Langkop delivered to the district court clerk two checks (each of which represented one-half of the total required deposit) accompanied by|6 a cover letter stating the jury deposit was being made on behalf of their clients and three other defendants, namely Baker, Seneca and Travelers. One of the two checks delivered with the letter was issued by Seneca, and the other was issued by Travelers.
The plaintiffs filed a motion to strike the jury, arguing that Seneca and Travelers, having requested a jury, had missed their deadline to deposit the costs and therefore had waived the right to trial by jury. The defendants counter-argued that BAC# 2 and Langkop, which had not requested a jury, had properly obtained a jury by depositing the requisite costs within ten days of the failure of any of the defendants that had requested a jury to timely make the deposit. The motion was heard on April 16, 2015. The transcript of the hearing reflects that the trial court made a factual determination that the defendants had acted in concert to allow certain insurers, which had requested a jury, to circumvent their deadline by making it appear that the jury deposit was being made on behalf of their insureds, which had not requested a jury. Therefore, the court found that the defendants had collectively waived their right to a jury trial. See, e.g.: Plauche v. Liberty Mutual Ins. Co., 2011-1288 (La.App. 3 Cir. 5/16/12), 89 So.3d 521.
Given the particular facts of this case, we cannot say this finding of the trial court was manifestly erroneous. Accordingly, we conclude the trial court did not err by granting the plaintiffs’ motion to strike the jury.
II. Duty/Risk Analysis
Liability in a negligence action is determined by employing a duty/risk analysis. Mathieu v. Imperial Toy Corp., 94-0952, p. 4 (La. 11/30/94), 646 So.2d 318, 321. To establish the liability of a defendant pursuant to this analysis, a plaintiff must prove five separate elements: (1) the defendant had a duty to|7 conform his or her conduct to a specific standard of care (the duty element); (2) the defendant failed to conform his or her conduct to the appropriate standard (the breach of duty element); (3) the defendant’s substandard conduct was a cause-in-fact of the plaintiffs injuries (the cause-in-fact element); (4) the defendant’s substandard conduct was a legal cause of the plaintiffs injuries (the scope of liability or scope of protection *436 element); and, (5) actual damages (the damages element). 94-0952, pp. 4-5, 646 So.2d at 322.
The appellants argue that the trial court erred by finding that, under the facts of this case, the plaintiffs proved three of these elements: (1) that BAC# 2 and Langkop owed Mr. Gordon a duty; (2) that either defendant breached this duty; and/or (3) that said breach was a cause-in-fact of Mr. Gordon’s death. Our review of this assignment of error requires us to consider the evidence presented at trial as to liability.
The fact witnesses who testified included Barbara Ann Coe, the owner and sole member of BAC# 2; Gene Langkop, who was managing the renovation of the BAC# 2 warehouse; Linwood (“Lin”) Hol-dridge, who was also working on the renovation project; Arnold Baker, the owner of Baker Ready Mix; and New Orleans Police Department Officer (“NOPD”) Gary Guggenheim, who investigated the accident. Two expert witnesses also testified: John Crawford, for the plaintiffs; and Roy Carruba, for the defendants.[3]
In September of 2011, Ms. Coe gave Mr. Langkop written authorization to act as the agent of BAC# 2. He was charged with finding a warehouse for BAC# 2 to use as a storage facility. Mr. Langkop located a suitable concrete building at |s2838 Elysian Fields Avenue and began negotiations to purchase it from its owner, Rayabco Holdings, LLC (“Rayabco”). Sometime prior to the act of sale, Mr. Langkop discovered water on the floor of the warehouse, and proceeded to investigate its cause.[4] On September 15, 2011, Mr. Langkop sent a letter to BAC# 2 opining that the water had leaked into the building from the alley behind it.[5] In the letter Mr. Langkop informed Ms. Coe that there was up to five feet of debris (fill dirt, concrete, brick, trash, metal, etc.) piled in the alley, which was exerting pressure on the back wall of the warehouse and apparently causing the wall to deteriorate, allowing the pooled water underneath to seep in. Mr. Langkop noted there was no access to the alley from Rayabco’s property, and that the debris had apparently been deposited there by the concrete company (Baker) located on the other (west) side of the alley. Mr. Langkop recommended that BAC# 2 hire a structural engineer to inspect the warehouse, assess any possible damage to the structure, and propose remedies, noting that all the debris would have to be removed prior to the inspection. He estimated that it would take up to ten days and cost between $20,000.00 and $30,000.00 to have the debris removed. Once authorized to proceed with the debris removal, Mr. Langkop hired Juan Thibodaux and Clarence Hebert to do the work, arranged for access to the alley from an adjacent property, paid them for the job (for which he was reimbursed by BAC# 2) and documented their work with photographs.[6] Mr. *437 Langkop testified that he Ubelieved Ray-abco was responsible for this excavation of the alley, but acknowledged that he had a role in determining the scope of the work, requiring that the grade of the alley upon completion be such as would not cause further drainage into the warehouse.[7] The excavation was completed prior to the October 6, 2011 act of sale by which BAC# 2 purchased the warehouse.
About a week later, on October 15, 2011, Mr. Langkop wrote a letter to Ms. Coe informing her that “due to the removal of the majority of the debris and overgrowth,” it had become apparent that the concrete block retaining wall built by Baker Ready Mix in the back of its elevated parking lot was “in imminent danger of collapsing” into the alley. Such a collapse would leave nothing blocking the parked concrete trucks from rolling onto BAC# 2’s property and damaging the rear wall of the warehouse. The letter further noted that the wall had been constructed in a haphazard manner “without a engineered structural foundation” and prior to the excavation had been “secured by the debris and concrete as a footing.” Mr. Langkop therefore recommended that a structural engineer be hired to determine the integrity of the concrete wall and the potential danger it posed to BAC# 2’s property.
Upon receipt of this letter, Ms. Coe authorized Mr. Langkop to consult a structural engineer. Mr. Langkop hired Roy Carruba, who performed a “limited structural visual inspection of the adjacent property owner’s segmented concrete block wall” and submitted his conclusions to Mr. Langkop in a November 21, 2011 letter, In that letter Mr. Carruba stated that the wall was “unsafe and could fail atlm any time.” He opined that the wall “must be removed and reconstructed in accordance with the applicable codes and regulations.” On December 1, 2011, Mr. Langkop sent a copy of this engineer’s report to Ms. Coe and advised her to contact her attorney with regard to the threat posed to BAC# 2’s property by Baker’s wall. In that letter Mr. Langkop emphasizes Mr. Carruba’s opinion that the wall would not survive the coming 2012 spring rains.
On February 6, 2012, an attorney representing BAC# 2 sent a letter to' Baker informing Baker of the danger posed by its wall. The letter explains that BAC# 2 had been forced to remove five feet of debris from its alley, apparently caused by Baker’s history of dumping construction materials there. BAC# 2’s attorney stated that his client was seeking reimbursement for the amount spent to remove this debris and demanded that Baker’s wall, which appeared to be encroaching onto BAC# 2’s property, be removed and reconstructed to prevent its collapse and further damage to BAC# 2’s property. Attached to this letter were photographs and a copy of Mr. Car-ruba’s report.
On March 16, 2012, counsel for BAC# 2 sent a second letter to Baker, again stating that Baker’s wall was encroaching on BAC# 2’s property and was in “chronic failure to such an extent that it appears that it will collapse at .any time.” In this letter the attorney for BAC# 2 sought a meeting within two weeks and noted: “This dire situation must be addressed *438 immediately.” Having received no response, on April 16, 2012, BAG# 2’s attorney sent a third letter to Baker raising essentially the same concerns.
InAmold Baker testified that he had received each of these letters and forwarded each to his attorney. Mr. Baker confirmed that his company owned the property on the opposite side of the alley and had built the concrete block wall in 2006. It was constructed by placing waste concrete into metal forms using a V-lock system, then stacking the blocks. The form system used was sold by another company, “World Block.” Walls of this same type were used all over Baker’s property as security perimeters and holding bins. Mr. Baker testified that when he received the first letter from BAC# 2 in February, he believed it was merely an attempt by BAC# 2 to get Baker to pay for BAC# 2’s removal of the debris in the alley. He thought that attempt was a “shakedown” because it accused Baker of having dumped the debris in the alley. Mr. Baker testified that his company had never dumped dirt, waste, concrete or debris into the alley, and that a majority of the debris removed by BAC# 2 had been there when Baker had purchased its property. Mr. Baker noted that his company was monitored by DEQ (the Department of Environmental Quality), and that if Baker had been dumping waste material into the alley, the alley would have filled up in approximately three weeks. Mr. Baker said the wall referred to in the letters had been standing for five years during various weather conditions, including tropical storms. He believed that to the extent it posed a safety issue, it was solely a property damage issue because as far as he knew, the alley was not accessible to anyone.
After receiving the first letter, Mr. Baker attempted to contact counsel for BAC# 2 but was not successful because BAC# 2 had changed counsel.[8] However, upon receipt of the April 16th letter, Mr. Baker, after consulting with his attorney,! 1⅞ agreed that his company should hire an engineer to inspect the wall. Therefore, on April 18th, two days after Mr. Baker’s receipt of that letter, his counsel sent a written response denying that Baker had any responsibility to pay for the debris removal and denying any encroachment of the wall, but stating that Baker would have an independent engineer inspect “the concrete blocks” stacked on its property and would address any safety concerns. Baker never had an opportunity to consult an engineer because the wall collapsed three days later, on April 21st. Shortly after the accident, Baker removed and reconstructed the wall.
While counsel for BAC# 2 was making the aforementioned attempts to communicate with Baker, the renovation of BAC# 2’s warehouse was ongoing. The $250,000.00 project, supervised by Mr. Langkop, was begun in November or December of 2011. Mr. Langkop testified he was not a licensed general contractor. Besides Mr. Langkop and Mr. Gordon, there were two other people working on the project: Mike Rouzzin, a carpenter; and Lin Holdridge, who was in charge of creative/decorative matters.[9] Although initially there was no access from the warehouse to the alley behind it, sometime around April 16th a door was cut in the back wall of the warehouse to provide such access. Mr. Langkop testified that this was done upon his recommendation. Ms. Coe, Mr. Lang-kop, Mr. Holdridge and Mr. Rouzzin all *439 testified that everyone working in the warehouse, including Mr. Gordon, was repeatedly told not to go into the alley because of the danger posed by Baker’s wall. Although both Ms. Coe and Mr. Langkop orally warned the workers, however, there were no warning signs, cones, yellow tape, or physical barriers put up near the door or the wall. Mr. Holdridge testified that the door was rarely opened, and that it was his responsibility to make sure it was locked at the | isend of each day. He could not recall ever having seen the door open until the day of the accident.
On that day, Ms. Coe arrived at the warehouse between 10:30 and 11:00 a.m. to check up on the project. It was a rainy day. She spoke to Mr. Rouzzin, Mr. Gordon and Mr. Holdridge, who were all working inside. Mr. Gordon was on a scaffold painting. She described Mr. Gordon as capable, hardworking, positive and upbeat. Before she left Ms. Coe wanted to speak with Mr. Langkop, but was told by Mr. Holdridge that he was in the alley pressure washing. She did not go into the alley because she knew it was dangerous, but stuck her head out the door and saw Mr. Langkop in the alley about one hundred feet away. Unable to get his attention, she turned to leave and was walking toward her van with Mr. Holdridge when they heard a rumbling sound and then heard screaming from the alley. Mr. Holdridge ran to the open door and saw what had happened, then prevented Ms. Coe from going out into the alley to see.
Mr. Langkop testified that he was in the alley that day using a gas-powered, ten to thirty pound pressure-washer on the rear wall of the warehouse to expose a joint that he believed needed to be sealed. This joint was located at the bottom of the rear wall, where the wall met the foundation. He estimated the joint was about one hundred fifty to two hundred feet from the door. He testified that he had positioned himself as close to the warehouse and as far away from the concrete block wall as possible because he knew it was dangerous. After pressure-washing for about ten to fifteen minutes, Mr. Langkop suddenly felt air pressure, heard rumbling and saw a concrete block rolling toward him. He jumped out of the way, 1 ^landing on top of the block. He then saw Mr. Gordon, who was about twenty feet away, laying on top the pressure-washer with a concrete block on top of him. Mr. Langkop attempted to move the concrete block off of Mr. Gordon but could not, and then felt for a pulse but could not find one.
Mr. Langkop described Mr. Gordon as a trusted worker who had caused no problems and had never done anything he was not told to do. Mr. Langkop testified that Mr. Gordon had not been assisting him with the pressure-washing, and he did not know why Mr. Gordon was in the alley that day. This testimony was impeached by that of NOPD Officer Gary Guggenheimer, who had been called to the scene of the accident to investigate. Officer Guggen-heimer testified that when he interviewed Mr. Langkop at the scene, Mr. Langkop told him that he asked Mr. Gordon to go get him a camera prior to the accident, but did not realize Mr. Gordon was in the alley until after the wall fell. Officer Guggen-heimer testified that he wrote this fact in his report, based upon which it was concluded that the event was an accident, and that no crime had occurred. He testified that he did not recall whether a camera had been found at the scene.
John Crawford, who was qualified as an expert in structural engineering and construction, testified that BAC# 2’s excavating of the debris, which had served as a stabilizing foundation for Baker’s concrete wall, was the predominant cause of the wall’s collapse. He opined that although *440 the wall was unstable from the time it was built, the excavation of the alley, the spring rains, and the vibrations from the pressure-washing all had made the wall more unstable, with the pressure-washing being “the final straw” that caused the wall to collapse,
Roy Carruba, who was qualified as an expert in structural engineering and project management, testified that the concrete block wall “had a strong probability of eventual collapse” on the day it was built because it was not properly constructed. He opined that Baker had failed to get a building permit before constructing the wall, which was required by the City building code.[10] He stated that the only retaining walls exempt from this permit requirement were those that were not over three feet high, whereas Baker’s wall was eight feet high. In order to apply for a permit, Baker would have had to get an architect or civil engineer to sign the necessary documents.
Unlike Mr. Crawford, who had examined the wall only after its collapse, Mr. Carru-ba had seen the wall both before and after it fell. Mr. Carruba said the wall was not vertical, and the top of the wall was leaning, even before the excavation of the alley. He opined that the trucks parked in Baker’s paved parking lot had exerted continuous lateral pressure on the wall, causing it to lean. He stated that Baker had further contributed to the problem because whenever a gap had appeared in the wall, Baker had poured in more concrete to fill the gap. Mr. Carruba did not agree that the primary cause of the wall’s collapse was the excavation of the alley. Asked to explain his November, 2011 report to Mr. Langkop, which noted that the debris in the alley had provided a stabilizing force for the wall, Mr, Carruba said he had changed his mind later after seeing a photo of the debris that was removed. He said his first opinion was an assumption made after viewing the wall following the excavation. However, the photo he later saw of the debris that had been removed during the excavation revealed that the debris was composed of primarily organic material, such as soil mixed with grass, weeds and concrete chunks. Mr. Carruba opined at trial that this debris had not been 11ficompacted tightly enough to stabilize the wall, but instead would have moved with the wall. He testified that it was impossible to determine when the wall would have failed had the debris remained, although he believed it would have eventually collapsed “no matter what.”
Mr. Carruba also did not agree with Mr. Crawford that the vibrations from the pressure-washing were the tipping point in causing the wall to collapse. He explained that the machine used was not big enough to cause vibrations that would have impacted the wall because the vibrations would have dissipated before they had travelled the eight feet through granular soil necessary to reach the wall.
On the basis of this evidence, the trial court found, as stated in written reasons for judgment, that the “defendants owed Mr. Gordon a duty to provide a safe work environment” and that “they failed to exercise reasonable care and breached this duty.” The court further found that the defendants’ actions had contributed to the collapse of the wall. The specific actions mentioned by the trial court were the excavation of the alley, the pressui-e-washing, the cutting of a door in the warehouse “leading to the alleyway providing easy access to the known danger,” the lack of posted warnings about the danger, and the fact that the door was not locked on the day of the accident. The trial court also *441 was persuaded by Officer Guggenheimer’s testimony, which indicated that Mr. Gordon was in the alley because he had been asked by Mr. Langkop to bring a camera there, despite Mr. Langkop’s denial of same. The trial court reasoned “the fact that there is no evidence that Mr. Gordon had a camera when the wall collapsed is of no moment as he could have been on his way to get the camera when he was killed.”
The trial court placed no liability upon Mr. Gordon for the accident. As noted previously, the court found BAC# 2 and Langkop, as the agent of BAC# 2, to 117be seventy-five percent at fault in causing Mr. Gordon’s death and allocated the remaining twenty-five percent fault to Baker, a settling defendant, for its lack of reasonable care in constructing and maintaining the wall and its failure to take reasonable action in response to BAC#2’s letters.
BAC# 2 and Langkop first argue that the trial court erred by finding that they owed a duty to Mr. Gordon under the circumstances presented here. Whether a duty is owed is a question of law. Lemann v. Essen Lane Daiquiris, Inc., 2005-1095, p. 8 (La. 3/10/06), 923 So.2d 627, 633 (citing cases). “In deciding whether to impose a duty in a particular case, the court must make a policy decision in light of the unique facts and circumstances presented. The inquiry is whether the plaintiff has any law (statutory, jurisprudential, or arising from general principles of fault) to support the claim that the defendant owed him a duty.” Id. (internal citation omitted).
BAC# 2 and Langkop argue that they had no duty to protect Mr. Gordon from a defect (the wall in danger of collapsing) that existed on the property of a third party (Baker) over which they had no control. This argument ignores the obvious. Although the wall was located on Baker’s property, its condition posed a danger to anyone who might be in the alley behind BAC# 2’s warehouse, over which BAC# 2 obviously had sole control.[11] Moreover, BAC# 2 and Langkop were clearly aware of this danger months prior to the accident. . Under Louisiana law, there is an almost universal duty on the part of the defendant in a negligence action to use reasonable care so as to avoid injury to another. See La. C.C. art. 2315; Boykin v. Louisiana Transit Co., Inc., 96-1932 (La. 3/4/98), 707 So.2d 1225, 1231. h «Moreover, “the owner or operator of a facility has the duty of exercising reasonable care for the safety of persons on his premises and the duty of not exposing such persons to unreasonable risks of injury or harm. The relationship of an employer to his employee gives rise to a similar duty.” Mundy v. Dep’t of Health & Human Res., 620 So.2d 811, 813 (La.1993) (internal citations omitted). We therefore find no legal error in the trial court’s conclusion that BAC# 2/ Langkop owed a duty to protect Mr. Gordon from the danger posed by the potential collapse of the wall into the alley.
The appellants next' argue that the trial court committed manifest error by finding that BAC# 2 and Langkop breached this duty. Whether a defendant has breached a duty owed is a question of fact. Mundy v. Dep’t of Health & Human Res., 620 So.2d 811, 813 (La.1993). In'the present case, there is ample evidence to show that BAC# 2, as represented by Langkop, did not behave as a reasonable premises owner and/or employer would have given its knowledge of the potential danger. BAC# 2 excavated the alley with *442 out notifying Baker or considering the potential effect of the excavation on the stability of the wall; despite obtaining Mr. Carrubba’s opinion subsequent to the excavation that the wall was in imminent danger of collapsing into the alley, BAC# 2 cut a door in the rear wall of its warehouse to allow access to the alley, which previously had been inaccessible; BAC# 2 took no measures to prevent those working on its renovation project from going near Baker’s wall other than verbally warning them not to enter the alley; and Mr. Langkop went into the alley and used a pressure-washer without considering the potential effect of the vibrations on Baker’s wall. Mr. Crawford opined that Mr. Langkop as general contractor/supervisor had failed to provide a safe work environment; that BAC# 2 should have consulted an engineer prior to | ^excavating the alley to determine how the excavation might impact the wall; that BAC# 2 should have informed Baker about its intent to excavate the alley prior to the excavation; and that despite having direct knowledge as early as October, 2011, that Baker’s wall was in imminent danger of collapsing, Ms. Coe and Mr. Langkop had failed to take appropriate action to barricade or otherwise keep their workers from the dangerous area. Given the evidence, the trial court’s finding that BAC# 2 and Langkop breached a duty owed to Mr. Gordon is not manifestly erroneous.
Appellants also argue the trial court committed manifest error in finding that their conduct caused Mr. Gordon’s death. Where the evidence shows the existence of concurrent causes for an accident, the proper inquiry is whether the conduct in question was a “substantial factor” in bringing about the accident. Bonin v. Ferrellgas, Inc., 2003-3024, p. 6 (La. 7/2/04), 877 So.2d 89, 94. In considering the substantial factor test, the Louisiana Supreme Court has stated that eause-in-fact clearly exists when the plaintiffs harm would not have occurred absent the specific defendant’s conduct. Id. Whether the defendant’s conduct was a substantial factor in bringing about the harm, and thus, a cause-in-fact of the injuries, is a factual question to be determined by the trial court. Id.
In the present case, Mr. Crawford testified that the excavation of the alley was the primary cause of the wall’s collapse and that the vibrations from the pressure-washing were the final straw that made the wall fail. Mr. Carubba disagreed, opining that the wall had collapsed because it had not been properly constructed, and that, ultimately, it had succumbed to constant lateral pressure exerted on it by the trucks in Baker’s parking lot. Mr. Carub-ba’s opinion in this regard was somewhat undermined by his first report, which had indicated that the removal of the debris had increased the instability of the wall, a discrepancy he | gnattempted to explain at trial. In addition, Officer Guggenheimer’s testimony indicated that Mr. Gordon was in the alley because Mr. Langkop had asked Mr. Gordon to bring him a camera. Despite Mr. Langkop’s testimony that he did not know why Mr. Gordon was in the alley, the trial court found the officer’s testimony to be credible.
The trial court’s finding of causation is not manifestly erroneous. As the Louisiana Supreme Court has recently emphasized:
The function of the Court of Appeal is to correct errors, not make choices it prefers over the District Court when there are two or more permissible views of the evidence.... Under a proper manifest error review, the analysis by the reviewing court should focus on whether there was clear error for lack of a reasonable basis in the conclusions of the factfinder. Rarely should a District *443 Court’s choice of expert(s) be found clearly wrong....
Hayes Fund for First United Methodist Church of Welsh, LLC v. Kerr-McGee Rocky Mountain, LLC, 2014-2592, p. 67 (La. 12/8/15), 193 So.3d 1110, 1150 (emphasis in the original). In the present case, the trial court’s conclusion that BAC# 2 and Langkop breached the duty of reasonable care owed to Mr. Gordon resulting in his death has a reasonable basis in the record and is not manifest error.
III. Allocation of Fault
Appellants next argue that the trial court erred by allocating a greater percentage of fault to BAC# 2 and Lang-kop than to Baker, which constructed the wall on its property and had sole custody and control of it. The trial court’s allocation of fault is reviewed under the manifest error standard. Brewer v. J.B. Hunt Transp., Inc., 2009-1408, p. 12 (La. 3/16/10), 35 So.3d 230, 239. Under this standard: “Ultimately, the issue to be resolved by the reviewing court is not whether the trier of fact was right or wrong, but whether the factfinder’s conclusion was a reasonable one. If the factual findings are reasonable in light of the record | ¾1 reviewed in its entirety, a reviewing court may not reverse even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently.” Id., pp. 12-13, 35 So.3d at 239 (internal citations omitted).
Reviewing the evidence according to this standard, we cannot say that the trial court’s allocation of seventy-five percent fault to the appellants and twenty-five percent to Baker is unreasonable. There was evidence that the wall was improperly constructed and therefore bound to fail at some unknown point in time. However, the evidence also showed that BAC# 2 and Langkop exacerbated the instability of the wall by excavating the alley without consulting Baker. Although the wall was located on Baker’s property, and Baker had been notified by BAC# 2 as to the wall’s unstable condition, Baker did not know anyone had access to the alley. In this respect BAC# 2 and Langkop possessed knowledge superior to that of Baker. Unbeknownst to Baker, BAC# 2 and Lang-kop created such access and then failed to adequately protect Mr. Gordon from being exposed to a known danger. Moreover, there was evidence that Mr. Langkop contributed to the already-dangerous situation by pressure-washing in the alley that particular day, and that Mr. Gordon would have not been in the alley but for Mr. Langkop’s request that Mr. Gordon bring him a camera. Given the totality of the evidence, we find no manifest error in the trial court’s allocation of fault.
IV. Damages
The appellants argue that the trial court abused its discretion by awarding excessive amounts of damages, for pain and suffering as well as for loss of financial support, to each plaintiff. As stated previously, the trial court awarded $350,000.00 for the pain and suffering of Mr. Gordon’s minor daughter, Kamri, and $32,819.69 for her loss of financial support, as well as $500,000.00 for thej g2 pain and suffering of Mr. Gordon’s minor son, Donte, and $58,135.80 for his loss of financial support.
It is well-settled that a trial court is afforded great discretion in its assessment of quantum, both general and special damages. Guillory v. Lee, 2009-0075, p. 14 (La. 6/26/09), 16 So.3d 1104, 1116; La. CC. art. 2324.1.[12] Furthermore, *444 the determination of the appropriate amount of damages by the fact finder is entitled to great deference on review. Wainwright v. Fontenot, 00-0492, p. 6 (La. 10/17/00), 774 So.2d 70, 74. “The role of an appellate court in reviewing a general damages award, one which may not be fixed with pecuniary exactitude, is not to decide what it considers to be an appropriate award, but rather to review the exercise of discretion by the trier of fact.” Guillory v. Lee, supra, 2009-0075, pp. 14-15, 16 So.3d at 1117. Because the discretion vested in the trier of fact is so great, and even vast, an appellate court should rarely disturb an award on review. Youn v. Maritime Overseas Corp., et al., 623 So.2d 1257, 1261 (La.1993), reh’g denied, 10/7/93.
At the time of Mr. Gordon’s death, neither of his two children was residing with him. Kamri Gordon lived with her mother, Katrina Horton, and Donte Gordon lived with his mother, Tonya Winford. The children did not testify. Ms. Horton and Ms. Winford testified with regard to the emotional damages suffered by their respective children, and Dr. Kenneth Boudreaux, an expert economist, testified as to his calculation of the loss of financial support suffered by each child.
Kamri, Gordon was.thirteen years old when her father died and sixteen at the time of trial. Ms. Horton, a high school principal with a master’s degree, testified 12<jthat she and Mr. Gordon had married in 1996, separated when Kamri was one-year-old, and divorced in 2001 when Kamri was three. Kamri had lived with her mother since her parents’ separation. The divorce decree provided that Mr. Gordon owed $75.00 per week in child support.
Ms. Horton testified that Mr. Gordon had a very loving relationship with Kamri and was very protective of her. Kamri spent a substantial amount of time with her father, including nights and weekends, prior to Hurricane Katrina. Mr. Gordon attended Kamri’s school events and took her on car rides. Mr. Gordon met with Ms. Horton regularly and gave her $250.00 to $300.00 per month in cash for Kamri’s support during this time period (between the divorce and Hurricane Katrina). He also bought Kamri birthday and Christmas gifts. When the hurricane hit New Orleans in 2005, Ms. Horton and Kamri evacuated to Texas, where they remained for approximately one year. During this time, Mr. Gordon spoke to Kamri by phone often but did not see her.
In 2007, about six months after Ms. Horton and Kamri had moved back to New Orleans, Kamri resumed spending time with her father on weekends and holidays. Mr. Gordon took Kamri to her favorite restaurants and to visit his family. Ms. Horton testified that Mr. Gordon made Valentine’s Day special for Kamri, giving her candy and teddy bears. He also attended Kamri’s school events, such as her sixth grade promotional ceremony. Mr. Gordon resumed paying the same amount of financial support that he had paid before but because Kamri was older, he gave the cash directly to her rather than to Ms. Horton. He saw Kamri approximately twice per month and had begun calling Kamri more frequently just prior to his death. He also assisted Ms. Horton with the cost of parties, clothes and| 9A electronics for Kamri. Ms, Horton estimated that Mr. Gordon provided $4,000.00 to $5,000.00 per year in financial support for Kamri.
Before her father’s death, Kamri was outgoing, vibrant, and á good student. She liked to write poetry. When Ms. Horton told Kamri her father had been killed, Kamri refused to come out of her room, and Ms. Horton slept with her that night. Kamri was emotional and angry on the day of her father’s funeral. After his death, Kamri became withdrawn and would get *445 upset whenever she called her mother and her mother failed to answer the phone. Kamri’s schoolwork and grades suffered. She continued to write poetry but lost friends and ceased some school activities. Kamri became defensive whenever she was asked about her father. Ms. Horton testified that Kamri still had anger at the time of trial. A few weeks after her father’s death in 2012, Kamri saw a child psychologist to help her deal with these issues.
Ms. Winford testified that her son Donte, who was seven years old when his father died and ten years old at the time of trial, was born in 2004 while she and Mr. Gordon were living together. Donte was born three weeks prematurely. Both she and Mr. Gordon took shifts doing “kangaroo care,” which involved placing Donte on the parent’s chest so that he would respond to his parent’s heartbeat. She and Mr. Gordon continued to live together for approximately four years after Donte’s birth. During that time Mr. Gordon worked as a painter and also cooked, did yard work and housework, and cared for Donte. When Hurricane Katrina hit, the three of them spent two weeks in Baton Rouge and then four months in Houston staying with relatives. In 2006, Ms. Win-ford was incarcerated for a time on bank theft charges, and during her incarceration, then two-year-old Donte was 125cared for by his father and Ms. Winford’s adult daughter, Latoya. Ms. Winford and Mr. Gordon broke up approximately one year after returning to New Orleans.
Following their breakup, Ms. Winford and Mr. Gordon remained friends. Mr. Gordon continued to help with Donte, assisting with homework and night prayers on week nights and spending every Saturday with Donte, as well as holidays and birthdays. Mr. Gordon spoke by phone with Ms. Winford concerning Donte’ two to three times per day, practically every day. On Saturdays Mr. Gordon and Donte would watch movies, play video games, go out to lunch and go to video game stores.[13] Mr. Gordon also took Donte to see his family and attended his son’s sports games and practices.
On the Saturday Mr. Gordon was killed, Ms. Winford was supposed to meet him at noon so he could take Donte to a video game store. When Mr. Gordon did not show up nor answer her phone calls, Ms. Winford took Donte to visit her older daughter. Ms. Winford received a phone call about 1:20 p.m. informing her that Mr. Gordon had been killed. She then called Mr. Gordon’s brother and met him at the home of Mr. Gordon’s mother so they could tell her. Ms. Winford then returned to her daughter’s house to tell Donte, calling Ms. Horton on the way. Donte cried, and Ms. Winford slept with him that night. At the funeral, Kamri held on to Donte.
Ms. Winford testified that Donte had become overly concerned and over protective of her since his father’s death. Donte sleepwalks, is withdrawn and isolated, and will not venture out of his comfort zone. He does well in school, however, and does not display any anger. Donte saw a psychologist twice peij g|j month for four months following his father’s death. Ms. Winford stopped these therapy sessions because they became unaffordable for her. She testified that. Donte will never get over his father’s death.
Ms. Winford testified that Mr. Gordon gave her $300.00 to $600.00 per month for Donte’s support, always in cash, and also bought Donte gifts and split the cost of his *446 birthday parties. She testified that Mr. Gordon provided approximately $7,000.00 per year in financial support.
Dr. Kenneth Boudreaux, an expert economist, testified as to the loss of financial support suffered by Kamri and Donte. He estimated the present value of those losses to be in a range between $19,259.96 and $32,819.69 as to Kamri, and between $46,125.44 and $58,135.80 as to Donte. Dr. Boudreaux based his calculations upon the deposition testimonies of the children’s mothers. At trial, Dr. Bou-dreaux acknowledged that since writing his report, he had received information from the Social Security Administration showing that from 2000 to 2010, Mr. Gordon had reported annual income in varying amounts that averaged a little less than $8,000 per year. Dr. Boudreaux testified that people like Mr. Gordon, who are often paid in cash, sometimes do not report all of their income to the federal government. Dr. Boudreaux additionally noted that documentary evidence submitted at trial showed that Mr. Gordon, who was paid weekly, had received a total of $22,050.00 for his approximately six months of work on the renovation of BAC# 2’s warehouse.
The appellants argue that the amounts of general damages awarded to the plaintiffs should be reduced because Ms. Horton and Ms. Winford were not] 27 credible witnesses.[14] Specifically, they argue that the plaintiffs did not present any other witnesses, such as relatives or friends, to corroborate the mothers’ testimony, nor introduce objective evidence, such as phone records.
As to Kamri, the appellants specifically point to the absence of any photos showing Kamri with her father as undermining her mother’s testimony. Additionally, the appellants argue that Ms. Horton’s testimony was refuted by the records of the psychologist who saw Kamri approximately two weeks after her father’s death. The psychologist’s notes reflect that Ms. Horton had described Mr. Gordon as an “absentee parent” and had stated that Kamri “did not have a good relationship with her father before his death.” We note, however, that the psychologist’s records also corroborate Ms. Horton’s testimony that Kamri had expressed anger at her father’s funeral, was having difficulty sleeping, and was spending “all of her time in her bedroom.”
As to Donte’s pain and suffering, the appellants did not present any witnesses or evidence at trial to contradict the testimony of Ms. Winford.
Credibility determinations are the province of the factfinder. The manifest error-clearly wrong standard demands great deference to the trier of fact’s findings as to credibility because only the fact-finder can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener’s understanding and belief in what is said. Rosell v. ESCO, 549 So.2d 840, 844 (La.1989). Considering the evidence, we cannot say the amounts of general damages awarded to the | ¡^plaintiffs are so unreasonable as to constitute an abuse of discretion. We therefore decline to disturb those amounts.
With regard to the amounts awarded the plaintiffs for loss of financial support, the appellants again argue that the plain *447 tiffs’ testimony was not credible as to the sums of money given to them by Mr. Gordon and that there is no objective evidence to support this testimony. However, the lack of objective evidence is easily explainable by the record, which suggests that Mr. Gordon was a person who primarily dealt in cash. Moreover, the defendants presented no evidence to refute the plaintiffs’ testimony other than the records indicating that Mr. Gordon’s income in the six months prior to his death was significantly greater than that which he had reported to the IRS in the prior ten years. However, this fact does not necessarily undermine the testimony of Ms. Horton or Ms. Winford. Considering Dr. Boudreaux’s testimony and the records showing Mr. Gordon’s payments from BAC# 2, it was reasonable for the trial court to infer that Mr. Gordon had not reported all of his prior income to the government. The plaintiffs presented no expert testimony to refute that of Dr. Boudreaux. The trial court awarded each of the children the highest amount within the range specified by Dr. Boudreaux. These amounts are supported by the evidence and do not constitute an abuse of the trial court’s discretion. Accordingly, we decline to reduce these awards.
CONCLUSION
For the reasons stated, we affirm the judgment of the trial court.
AFFIRMED
LOBRANO., J., DISSENTS AND ASSIGNS REASONS.

. The trial court found that at all pertinent times, Mr. Langkop was acting as the agent of BAC# 2 pursuant to written authority; this finding is not challenged on appeal.

. The defendants’ writ application is contained in the appellate record. Katrina Horton v. Blackrock Aggregates, 2015-0419 (La. App. 4 Cir. 4/22/15) (unpub.) The defendants filed a writ application in the Louisiana Supreme Court seeking review of this court’s decision, which was denied. Katrina Horton v. Blackrock Aggregates, 2015-0818 (La. 4/27/15), 169 So.3d 366 (Mem).

. The parties also introduced more than one hundred joint exhibits, including the deposition testimony of additional fact witnesses, as well as numerous individual exhibits.

. Mr. Langkop testified that BAC# 2 wanted to pull out of the sale at this point but did not because Rayabco threatened to sue.

. According to the record, the alley was owned by third parties not involved in this appeal. The portion of the alley located behind the warehouse was purchased by BAC# 2 from its owner in a separate transaction on the same day that BAC# 2 purchased the warehouse from Rayabco.

.The record reflects that there was no access to the alley from Rayabco's property, and that a fence was blocking access to the alley from the adjacent property on one side and a large container was blocking access from the adjacent property on the other side. Mr. Langkop arranged to have the container temporarily moved.

. A September 28, 2011 addendum to the act of sale between Rayabco and BAC# 2 gave BAC# 2 the right to access the property to clean up and haul off the debris behind the warehouse and provided that BAC# 2 would hold the seller harmless for any damages or injuries that might occur during the purchaser’s early access to the property. At trial, the parties stipulated the Rayabco be dismissed with prejudice and not be' considered in the allocation of fault.

. Ms. Coe testified she had changed attorneys due to the delay in getting any response from Baker.

. Mr. Rouzzin's deposition was introduced into evidence in lieu of his testimony.

. The New Orleans Building Code was introduced into evidence.

. The record reflects that at the time of the accident, BAC# 2 owned at least the portion of the alley directly behind its warehouse.

. That article provides: "In the assessment of damages in cases of offenses, quasi offenses, and quasi contracts, much discretion must be left to the judge or jury.”

. Two photos depicting Donte’ with his father the Saturday prior to Mr. Gordon's death were introduced into evidence.

. The appellants submit that Ms. Horton lied on the stand when she testified that a photograph introduced into evidence depicted a Valentine card signed by Mr. Gordon for Kamri. After the handwriting was challenged, Ms. Horton stated that she had signed Mr. Gordon’s name because he had asked her to. As to Ms. Winfield, the appellants argue that her testimony was not credible because she admitted to having been convicted of bank fraud.