# United States Court of Appeals
## for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

July 22, 2022

Lyle W. Cayce
Clerk

No. 20-30739

---

Erie Moore, Jr.; Tamara Green; Tiffany Robinson,

*Plaintiffs—Appellants*,

*versus*

LaSalle Management Company, L.L.C., *incorrectly named as* LaSalle Corrections L.L.C.; Ray Hanson; Gerald Hardwell; Roy Brown; Reginald Williams; Kenneth Hart; Danielle Walker; Duan Rosenthal; Jeremy Runner; Reginald Curley, *incorrectly named as* Reginald Curly; City of Monroe; Sheriff of Ouachita Parish; Donald Murphy; Chase Wells; Tommy Crowson, *incorrectly named as* Officer Crowson; William Mitchell, *incorrectly named as* Nurse Mitchell; Alton Hale; Richwood Correctional Center, L.L.C.; Archie Aultman, *incorrectly named as* Aultman,

*Defendants—Appellees*.

---

Appeal from the United States District Court
for the Western District of Louisiana
USDC No. 3:16-CV-1007

---

Before Higginson, Willett, and Ho, *Circuit Judges*.

Don R. Willett, *Circuit Judge*:

No. 20-30739

Erie Moore was arrested for disturbing the peace and taken to a private prison. One day later, Moore was dead—the victim of a traumatic brain injury that, experts say, prison staff inflicted through repeated blows to his head. Indeed, staff had bragged—openly and for years—about punishing handcuffed inmates with pepper spray and beating them senseless in a cameraless corridor. Plaintiffs say that's what happened here.

Some of Plaintiffs' claims made it past summary judgment. Others did not. For the reasons below, we AFFIRM in part, REVERSE in part, and REMAND for proceedings consistent with this opinion.

I

A

Many cities privatize their prisons. Monroe, Louisiana is no exception. From 2001–2019, the City engaged Richwood Correctional Center, LLC, to house arrestees and inmates. Their agreement required Richwood to "operate, manage, supervise and maintain the facility and provide for the secure custody, care and safekeeping of inmates" in accordance with certain state standards. Richwood assigned its rights and obligations under the agreement to LaSalle Management, LLC. In short, Richwood owned the prison. LaSalle ran it. And as part of running the prison, LaSalle hired Ray Hanson to serve as warden. In that role, Hanson set policy for the prison.

What these policies actually were, though, casts a dark shadow over this case. The City's agreement with Richwood included instructions governing the "punishment of inmates." But paper and practice don't always match up. Indeed, there's some evidence to suggest that Hanson never read those instructions. And former staff paint a grim picture of what went as customary punishment at the prison.

2

Yolanda Jackson is one of those former staffers. She worked at the prison for about three years. According to Jackson, "[o]n many occasions she . . . witnessed [guards] including supervisors use chemical spray on handcuffed prisoners routinely, many, many times." The practice was common enough for guards to have a name for it: "pepper spraying mode." In fact, two Defendants admitted under oath to using chemical spray on multiple restrained detainees. And these practices persisted, too, despite Jackson "advis[ing] supervisors and others that they [were] not allowed to punish prisoners who are handcuffed." Guards and supervisors alike advised Jackson that they'd "do what they want[ed]" with prisoners.

Unfortunately, guards doing what they wanted to prisoners extended beyond pepper spray, according to Jackson. Cameras at the prison abound—except in one twelve-by-twelve-foot area. Called the "Four-Way" by the parties, it's the one area of the prison with no cameras. Per Jackson, "many" guards openly bragged to her about taking prisoners to the Four-Way to "teach them a lesson" off camera through "force." Even an Assistant Warden at the prison admitted that both he and guards used the Four-Way to "interrogate" prisoners. And two prison guards have testified under oath that they used the Four-Way to interrogate and abuse multiple handcuffed detainees. As Jackson summarized in her testimony, these practices at the prison were "wide spread."

B

Police arrested Erie Moore for "disturbing the peace" at a donut shop in Monroe, Louisiana. Police then transported Moore to the prison for booking. As part of the booking process, staff brought Moore to the on-staff nurse, William Mitchell, for a medical screening. But Moore was agitated and noncompliant. According to Mitchell, he was unable to properly examine

Moore. Without completing Moore's screening, staff placed Moore into a lockdown cell.

Lockdown cells are generally used to "cool off or sober up" detainees. Not this time. Gerald Hardwell was the shift supervisor on duty. He could have placed Moore in a cell alone. But no. Instead, and without reviewing Moore's history or consulting anyone else, Hardwell eventually paired Moore up with another cellmate. Moore's new cellmate was Vernon White, another combative detainee. This arrangement proved fatal.

By early morning the next day, Moore and White had their first fight. Guards broke them up, only to place them back together. Moore and White began round two later that afternoon. A guard, Jeremy Runner, suspected something was wrong after seeing only Moore on a monitor for a long time. Runner was right.

Runner moved to the cell and found White on the floor. White was apparently seizing and had blood around his mouth. Runner left to get backup and the cell's key. Guards then entered the cell to extract White. Moore ignored the guards' verbal instructions, though. In response, Christopher Loring sprayed Moore in the face with chemical spray. Runner then struck Moore in the back of the head, knocking him to the ground. Officers then dragged White into the hall. White later died at a nearby hospital.

Moore, alone in the cell for nearly an hour, removed his shirt and wiped his face and eyes—noticeably bothered by the pepper spray. Meanwhile the guards formed a plan to extract Moore from the cell. Among them were Hardwell, Runner, Reginald Williams, and Reginald Curley. Moore was sitting on the bottom bunk when Hardwell entered the cell. Hardwell sprayed Moore in the face again. The guards then left to retrieve gas masks and returned to extract Moore.

Gas masks retrieved, Hardwell again entered Moore's cell. Williams followed. Runner stood outside the door with Curley. With Moore's back to the door and hands placed on the top bunk, Hardwell grabbed Moore around the chest. Hardwell then picked Moore up and moved him toward the open door. He carried Moore while walking backward. Hardwell then suddenly pivoted, slamming Moore onto the ground in the process. Moore's body and head hit the floor. Subdued, two guards moved to pick up a handcuffed and face-down Moore. One guard held Moore's legs. Runner grabbed Moore's arms. With Moore in tow, the guards started walking. But then they stumbled. Moore hit the ground—headfirst. Guards then picked Moore back up and carried him to the Four-Way.

It's unclear what all happened during Moore's roughly two hours in the Four-Way. As we explain below, we construe the record evidence and make all inferences in favor of Plaintiffs in this posture. In that light, some evidence suggests that off-camera guards repeatedly beat and pepper-sprayed Moore until he lay unconscious. One guard, John Badger, testified that another guard who had been present in the Four-Way with Moore had bragged about bringing Moore to the cameraless Four-Way so guards could "beat him [to] death" and "finish[] him." Mitchell likewise testified that he had heard a "commotion" in the Four-Way as guards subdued Moore. Moore was still responsive at that point. He confirmed that he was "sore" and that his handcuffs were "too tight." Mitchell also noticed a "vanilla wafer"-sized bump on the middle of Moore's head—not present the day before during Moore's screening. Mitchell left but later returned. This time Moore was unresponsive. But Mitchell did not check Moore's vitals. All Mitchell did was to see if he could get Moore to wake up, something he tested by rubbing Moore's sternum in a way that would wake a healthy patient. Moore responded only with a grimace and grunt but remained unconscious. Mitchell did not report his observations or otherwise treat Moore before

No. 20-30739

sheriff's deputies picked up Moore from the prison in connection with White's death.

Deputies testified the Four-Way smelled of fresh pepper spray and Moore's pants were saturated. When transporting Moore to their vehicles did not wake him, Deputies realized that something was "obvious[ly]" wrong. Moore was brought to a hospital soon after. He was comatose and had to be intubated. Medical personnel determined Moore suffered a fractured skull. He never woke up. Moore died on November 14, 2015.

At least some experts have pinned Moore's death to the head trauma he received in the prison. For example, the parish coroner, Dr. Teri O'Neal, ruled Moore's death a "homicide," caused by "head injuries received while in jail" creating "pneumonia complicating [those] blunt force head injuries." O'Neal said blunt force trauma to the head caused a subdural hematoma. But after reviewing the video footage depicting the recorded head impacts, O'Neal declined to conclude which strike to Moore's head was the source of the injury. Similarly, one of Moore's treating physicians, Dr. John Owings, couldn't definitively say when Moore sustained his injuries either. He could, though, narrow things down. Based on Moore's CT-scans and video footage, Owings testified that Moore sustained his fatal injury at the prison either after he was removed from his cell or right before. Other treating physicians agreed with that assessment. A pre-prison injury, in their view, would have prevented Moore from physically exerting himself while inside his cell.

C

In the wake of Moore's death, Plaintiffs sued. They brought various federal and state-law claims under 42 U.S.C. § 1983 against several prison staffers, LaSalle, Richwood, and the City. The district court narrowed Plaintiffs' claims for trial across eight summary judgment orders. Among

6

No. 20-30739

other things, it granted summary judgment to Defendants on Plaintiffs' claims against:

- the Individual Defendants—Runner, Hardwell, Curley, Williams, and Mitchell—for deliberate indifference;
- the Individual Defendants for having *caused* Moore's death;
- Runner, Hardwell, Curley, and Williams for punitive damages;
- the Corporate Defendants—LaSalle and Richwood—for vicarious liability based on any Individual Defendant violating federal law;
- the Corporate Defendants, plus the City, for liability under the Supreme Court's decision in *Monell v. Department of Social Services*;[1] and
- the Corporate Defendants for punitive damages.

With their remaining claims pending for trial,[2] Plaintiffs moved the district court to deem its judgment on these issues final.[3] The district court granted the motion, and Plaintiffs now appeal.

---

[1] 436 U.S. 658 (1978).

[2] Other state and federal claims remain pending in the district court. For example, excessive-force claims against individual defendants, plus state-law claims the Corporate Defendants. However, Plaintiffs have—mercifully—"sought to narrow the issues on appeal." *See Ries v. Quarterman*, 522 F.3d 517, 531–32 (5th Cir. 2008) ("Counsel need not raise every nonfrivolous ground of appeal, but should instead present solid, meritorious arguments based on directly controlling precedent." (quoting *Schaetzle v. Cockrell*, 343 F.3d 440, 445 (5th Cir. 2003))). We review now only those issues they explicitly preserved for appeal and adequately briefed. We do not address other claims, though, that Plaintiffs appealed but did not raise in their opening brief. Those claims were abandoned. *Akuna Matata Investments, Ltd. v. Tex. Nom Ltd. P'ship*, 814 F.3d 277, 282 n.6 (5th Cir. 2016) ("Generally, issues not raised in the appellant's opening brief are considered abandoned.").

[3] *See* Fed. R. Civ. P. 54(b).

No. 20-30739

II

We review summary judgment de novo.[4] Courts may grant summary judgment on an issue only when "no genuine dispute as to any material fact" exists "and the movant is entitled to judgment as a matter of law."[5] A fact dispute is "genuine" if "a reasonable jury could return a verdict for [the nonmovant] based on the evidence."[6] "[W]e must view all evidence and draw all justifiable inferences in favor of . . . the nonmovant"—here, Plaintiffs.[7]

III

We turn first to Plaintiffs' § 1983 claims against the Individual Defendants. Plaintiffs contend that the Individual Defendants acted deliberately indifferent toward Moore and caused his death. The district court concluded that Plaintiffs cannot prevail on these claims and that Mitchell was entitled to qualified immunity. We *mostly* disagree.

A

The district court concluded that "no proof" supported Plaintiffs' deliberate-indifference claims. The Fourteenth Amendment protects a pretrial detainee's right "not to have [his] serious medical needs met with deliberate indifference on the part of the confining officials."[8] Plaintiffs needed to raise fact disputes over whether each Individual Defendant

---

[4] *Batiste v. Lewis*, 976 F.3d 493, 500 (5th Cir. 2020) (citation omitted).

[5] *Id.* (quoting *Rogers v. Bromac Title Servs., L.L.C.*, 755 F.3d 347, 350 (5th Cir. 2014)).

[6] *Coleman v. BP Exploration & Prod., Inc.*, 19 F.4th 720, 726 (5th Cir. 2021) (citation omitted).

[7] *Id.*

[8] *Thompson v. Upshur Cnty.*, 245 F.3d 447, 457 (5th Cir. 2001) (citations omitted).

No. 20-30739

(1) "was 'aware of facts from which the inference could be drawn that a substantial risk of serious harm exists,'" and (2) "actually drew that inference."[9] Plaintiffs have done so.

A reasonable jury could conclude on this record that each Individual Defendant was aware of inferential facts establishing a substantial risk of serious harm. Runner personally struck Moore in the head. Runner, Williams, Hardwell, and Curley all witnessed Moore strike his head on the prison's concrete floor repeatedly. Mitchell, likewise, observed Hardwell, Curley, and Runner getting "pretty rough" with Moore in the Four-Way. Mitchell also saw a new "knot" on Moore's head. All of the Individual Defendants later observed Moore unconscious in the Four-Way, including Mitchell, who couldn't wake Moore with a "sternum rub." And yet, not one of these Defendants sought medical care for Moore.

Likewise, a reasonable jury could find on this record that each Individual Defendant actually inferred that a substantial risk of serious harm existed. Again, each one of them had personal knowledge that Moore had gone unconscious after suffering strikes to his head—not to mention that some evidence suggests that Runner, Williams, and Hardwell all later tried to conceal or downplay the strikes. Indeed, putting Moore at a substantial risk of serious harm may have been the point. As one guard later bragged, Moore had been brought to the cameraless Four-Way so guards could "beat him [to] death" and "finish him."

---

[9] *Dyer v. Houston*, 964 F.3d 374, 380 (5th Cir. 2020).

No. 20-30739

Plaintiffs have met their burden at this stage. A reasonable jury could find that the Individual Defendants acted deliberately indifferent toward Moore on this record.[10]

B

The district court dismissed all Plaintiffs' federal and state-law claims against the Individual Defendants "for the death of Moore due to excessive force." For the reasons below, we think that was mostly premature. Save for claims against Mitchell, Plaintiffs have raised fact disputes on causation arising from their excessive-force claims.

(1)

The district court reasoned that all these claims "share a common element: medical causation." In the district court's view, "identical arguments" explained why both sets of claims could not "establish medical causation." But that view is a bit misleading. Simply put, *causation* isn't so easy under § 1983. And this case shows why.

The complexity starts with what law governs causation in a § 1983 suit. We've explained that Plaintiffs bringing § 1983 claims must show "(1) a deprivation of a right secured by federal law (2) that occurred under color of state law, and (3) was caused by a state actor."[11] Section 1983 is a federal

---

[10] The dissent would hold that Plaintiffs failed to raise a fact dispute on deliberate indifference. *Post* at 6–7. We agree with the dissent that there's evidence going both ways on this record. Nonetheless, the nonmovant Plaintiffs were entitled to all justifiable inferences at summary judgement. *See Coleman*, 19 F.4th at 726. Our characterization of the record reflects those inferences.

[11] *Victoria W. v. Larpenter*, 369 F.3d 475, 482 (5th Cir. 2004).

statute. Does that mean that federal common law governs causation?[12] Not quite. The Supreme Court has told us to read § 1983's causation requirement "against the background of tort liability that makes a man responsible for the natural consequences of his actions."[13] Applying that principle often means looking to "authoritative" treatises, like the Restatement (Second) of Torts, for "the prevailing view of the American common-law courts."[14] So while a state's caselaw might help us find or illustrate the prevailing view, it generally doesn't bind us.

But every rule has an exception. Sometimes state law *does* bind us on causation in § 1983 cases—in some ways, at least. We explained one of those ways in *Phillips ex rel. Phillips v. Monroe County*.[15] A plaintiff bringing a state-law wrongful death claim under § 1983, we said, must "prove *both* the alleged constitutional deprivation required by § 1983 and the causal link between the defendant's unconstitutional acts or omissions and the death of the victim, as required by the state's wrongful death statute."[16] In other words, *state law* governs whether there's a causal link between the constitutional deprivation and the victim's death for state wrongful death claims.

---

[12] *See* Martha A. Field, *Sources of Law: The Scope of Federal Common Law*, 99 Harv. L. Rev. 881, 893–94 (1986) (explaining how some "definition[s] of federal common law include[] much we think of as interpretation . . . leav[ing] no clear-cut line between federal common law and federal interpretational law" (footnote omitted)).

[13] *Monroe v. Pape*, 365 U.S. 167, 187 (1961), *overruled on other grounds by Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 695–701 (1978).

[14] *See Field v. Mans*, 516 U.S. 59, 72 (1995); *id.* at 70 (calling the Restatement (Second) of Torts the "most widely accepted distillation of the common law of torts"); *see also, e.g.*, *Murray v. Earle*, 405 F.3d 278, 291 (5th Cir. 2005) (adopting the Restatement's view on superseding cause in a § 1983 case).

[15] 311 F.3d 369 (5th Cir. 2002).

[16] *Id.* at 374 (emphasis added).

So if sometimes we use background principles and other times we use state-specific principles, then how do we know when to use which? To answer that we must "pause," as we did in *Phillips*, "to emphasize the importance of the distinction between survival and wrongful death causes of action."[17] Claims brought as part of a survival action, we said, "redress[] any constitutional injuries suffered by the Decedent *before* his death."[18] Because a state's wrongful-death statute isn't required for the survivors to recover, we apply background principles to causation. Indeed, often survivors don't even have to prove the cause of the victim's death to recover.[19] Wrongful death claims are different, though. Since they "create new causes of action on behalf of the statutorily-designated persons in order to compensate them *for the death* of the decedent," plaintiffs must prove the cause of the decedent's demise under state causation principles to recover.[20]

Further complicating matters is that survival actions and wrongful death claims are often brought together. This case is an exemplar. According to their Third Amended Complaint, Plaintiffs brought their § 1983 claims against the Individual Defendants *both* as Moore's survivors *and* for wrongful death. Plaintiffs even partially mix the two actions together by arguing that the Individual Defendants' deliberate indifference is what caused Moore's

---

[17] *Id.* at 373 n.1.

[18] *Id.*

[19] *See Slade v. City of Marshall*, 814 F.3d 263, 265–66 (5th Cir. 2016) (explaining that *survivors* bringing deliberate-indifference claims do not need to show "a causal link between [an] alleged denial of medical care claim and the decedent's death"); *see also Estate of Owensby v. City of Cincinnati*, 414 F.3d 596, 604 (6th Cir. 2005) (same); *Simpson v. Hines*, 903 F.2d 400, 403–04 (5th Cir. 1990) (holding that guards acted with deliberate-indifference based on their knowledge and conduct in the aftermath of a struggle with a prisoner, as opposed to the struggle itself causing the prisoner's death).

[20] *Phillips*, 311 F.3d at 374 (emphasis added).

death. We don't have to review that mixed question today, though, since the Individual Defendants didn't ask for summary judgment on it. We do, though, need to review the district court's conclusion that the Individual Defendants did not cause Moore's death through their *excessive force*.[21] But whether Plaintiffs' claims are construed as part of a survivorship action or as arising under Louisiana's wrongful death statute, we mostly disagree with the district court. On this record, sans the Mitchell claims, Plaintiffs have at least raised disputed facts on the cause of Moore's death.

(2)

We start with causation for Plaintiffs' excessive-force claims brought as Moore's *survivors*. Again, and as we explained above, Moore's survivors do not have to show that the Individual Defendants caused his death to recover for excessive force. To prevail on an excessive-force claim, a plaintiff need only show "(1) *an injury* (2) which resulted directly and only from a use of force that was clearly excessive, and (3) the excessiveness of which was clearly unreasonable."[22] The injury need not be severe.[23] Even so, Plaintiffs' excessive-force claims based on Moore's less-than-lethal injuries are still pending in the district court. So our review of Plaintiffs' survivorship claims based on excessive force is limited: Did Plaintiffs raise a fact dispute over if the Individual Defendants' excessive force caused a *lethal* injury to Moore? Except for Mitchell, Plaintiffs succeeded.

---

[21] The Individual Defendants did not seek summary judgment on the former question. But the district court granted summary judgment to them on the latter.

[22] *Ontiveros v. City of Rosenberg*, 564 F.3d 379, 382 (5th Cir. 2009) (emphasis added).

[23] *See Alexander v. City of Round Rock*, 854 F.3d 298, 309 (5th Cir. 2017) (explaining that the severity of the injury is irrelevant to the unreasonableness of the force).

Our decision in *Simpson v. Hines*[24] instructs us here. In *Simpson*, police arrested a man and put him into a stationhouse cell without having searched him.[25] Why didn't they search him? Because he had "arriv[ed] at the stationhouse in an evidently volatile, drug-affected state, [and] refused to be searched."[26] Further, and though we omitted some details in our opinion,[27] the briefs in *Simpson* explain that the man had concealed marihuana cigarettes and started smoking them in his cell. After discussing the situation, the police decided to enter the man's cell to search him and remove contraband.[28] Ten police officers entered the man's cell to conduct the search and seizure, "collectively us[ing] physical force against him."[29] The man died as a result. The police argued, though, "that they [could not] be held individually liable absent evidence that each defendant's actions caused severe injuries."[30] We rejected that argument, reasoning "the officers discussed beforehand how to handle the situation and functioned as a unit once inside [the man's] cell."[31] In doing so we distinguished situations in which "several separate and

---

[24] 903 F.2d 400 (5th Cir. 1990).

[25] *Id.* at 401.

[26] *Id.*

[27] *See id.* (noting that the man "brandished marihuana"); *id.* at 403 (explaining that "officers discussed beforehand how to handle the situation" before entering the man's cell).

[28] Brief for Plaintiff-Appellee at *3–4, *Simpson v. Hines*, 903 F.2d 400 (5th Cir. 1990) (No. 89-6204), 1990 WL 10081738.

[29] *Simpson*, 903 F.2d at 403.

[30] *Id.*

[31] *Id.*

discrete incidents of official malfeasance" lack "identity of either purpose or action."[32]

Parallels with *Simpson* abound in this case. In *Simpson* the detainee arrived at the stationhouse intoxicated and refused to cooperate with the booking process. So too here. In the City's own words, "Once at Richwood, Moore refused to cooperate with booking and appeared intoxicated." In *Simpson* a subsequent event (smoking marihuana) compelled police to discuss entering the man's cell. Here, too, White and Moore's altercation and its aftermath caused the guards to discuss entering "Moore's cell to secure and extract [him] in preparation for the Sheriff's Office's arrival." In fact, the pre-entry discussions appear even more extensive here than in *Simpson*. The City admits that in preparation for the final extraction, the guards sprayed Moore with a chemical spray, "retrieve[d] gas masks," and generally "prepared to enter the cell." Finally, in *Simpson* the police worked together as a group to use force to subdue the man in his cell to achieve their aim, searching for and seizing contraband. So, too, did the guards here. They worked together to forcibly extract Moore from his cell and subdue him to achieve their aim, turning Moore over to the Deputies.

Indeed, if this case is distinguishable from *Simpson* at all on causation it's because the record facts here on functioned-as-a-unit causation are *even stronger*. Guards took Moore to the cameraless Four-Way right after extracting him from his cell. As we explain below, there's a fact dispute over whether a custom of physically punishing prisoners in the Four-Way existed. Plus, the district court erred when it granted the Individual Defendants summary judgment on whether they adhered to that custom by collectively

---

[32] *Id.*

beating Moore in the Four-Way.[33] The district court found no fact dispute because the guard who bragged about pepper spraying and beating Moore to death in the Four-Way "named only Foster." True, but the guard also said that "*there was four of them* beating [Moore]," and that "*they* had already pepper sprayed" Moore "several times." Between those statements and record evidence placing the Individual Defendants in the Four-Way with Moore, a reasonable jury could conclude on this record that the Individual Defendants beat and pepper-sprayed Moore in the Four-Way.[34]

On this record, then, Plaintiffs raised a fact dispute for their survivorship claims on whether the Individual Defendants caused Moore's death through excessive force. That is, with one exception—nurse Mitchell. Plaintiffs do not argue or point to record evidence showing that Mitchell ever used or was otherwise involved with the use of excessive force against Moore. Therefore, the district court *did not* erroneously grant summary judgment to Mitchell on this issue.[35]

---

[33] Plaintiffs' contention in Reply that "[t]he district court correctly denied summary judgment on this issue" is somewhat misleading. True, the district court did deny summary judgment this issue to Defendant Foster, who is not a party to this appeal. But, as we explain, the district court also *granted* summary judgment to the Individual Defendants, who are parties to this appeal, on whether they beat and pepper-sprayed Moore in the Four-Way.

[34] Admittedly there's a discrepancy between testimony that "four" guards beat and pepper-sprayed Moore and a fact dispute existing for five of them having done so—Foster plus the Individual Defendants. We note, however, that the relevant testimony was not that *Foster* beat and pepper-sprayed Moore. Rather, the testimony was that Foster had painted himself as a hero who'd gone to the Four-Way and, unsuccessfully, stopped the *other* four guards from "killing" Moore.

[35] The dissent disagrees that *Simpson* supports a fact dispute on causation. In its view "*Simpson* dealt with a single discrete event in which the defendants acted in unison," but "[t]his case, by contrast, involves several discrete events, separated by hours of time, and implicating different defendants." *Post* at 3. We agree with the dissent that we said in

No. 20-30739

(3)

That brings us to causation for Plaintiffs' non-survivorship claims under Louisiana law. Plaintiffs contend that they have raised a fact dispute that the Individual Defendants' actions were "substantial factors" in causing Moore's death. The district court concluded they have not. Applying Louisiana law, it found "Plaintiffs have produced no evidence that any Defendant played so important a role in producing Moore's death that responsibility should be imposed upon him." Again, we mostly disagree. Under Louisiana law and excepting Mitchell, Plaintiffs have raised fact disputes over whether each Individual Defendant's excessive force was a substantial factor in causing Moore's death.

Plaintiffs point us to the Louisiana Supreme Court's decision in *Bonin v. Ferrellgas, Inc.* as governing substantial-factor causation in Louisiana.[36] Under *Bonin*, Plaintiffs can prove causation by showing "the conduct in question was a substantial factor in bringing about the accident."[37] The test is often used for "cases where there are multiple possible causes-in-fact, but the trial judge or jury may not be able to conclude that the accident most likely would not have happened but for any one of the causes."[38] Louisiana courts

---

*Simpson* that officials do not function as a unit when "plaintiffs complain[] of several separate and discrete incidents of official malfeasance." *Post* at 3 (quoting *Simpson*, 903 F.3d at 403). Where we disagree with the dissent is in its factual *characterization* of what happened here. Simply put, a reasonable jury could find on this record that the Individual Defendants (save for Mitchell) all had the same "identity" of "purpose" and "action" in dragging Moore from his cell to the Four-Way to finish him. *Id.* at 403.

[36] 877 So.2d 89 (La. 2004).

[37] *Id.* at 94.

[38] *Perkins v. Entergy Corp.*, 782 So.2d 606, 612 (La. 2001) (citing Frank L. Maraist & Thomas C. Galligan, Louisiana Tort Law, § 4-3 at 86-88 (1996)).

consider "whether each of the multiple causes played so important a role in producing the result that responsibility should be imposed upon each item of conduct," and "whether the actor's conduct has created a force or series of forces which are in continuous and active operation up to the time of the harm."[39]

On this record, a reasonable jury could conclude that each Individual Defendant, except for Mitchell, played an important role in causing Moore's death. Video evidence shows Moore's head striking the ground repeatedly—strikes caused by Runner punching Moore, Hardwell slamming Moore onto the ground, and two other guards dropping Moore on the ground while carrying him. That's together with evidence that guards bragged that they had "beat" Moore to "death" in the Four-Way, "finish[ing] him" in the one area of the Prison without cameras.

Relatedly, a reasonable jury could conclude that these head strikes formed an unbroken series of forces leading up to Moore's death from subdural hematoma.[40] Dr. Nelson, one of Moore's treating emergency-room physicians, testified that, more likely than not, Moore suffered his fatal head trauma no later than five-hours prior to arriving at the hospital. Another of Moore's treating physicians, Dr. Owings, similarly testified that Moore sustained his subdural hematoma while in custody. Not that Plaintiffs needed expert medical testimony in any event. "[A]s a general rule," in Louisiana, expert medical testimony isn't required when "it is self-evident that" an action "was a cause in fact of a . . . personal injury"—i.e., when the relevant

---

[39] *Bonin*, 877 So.2d at 94 (quoting *Perkins*, 782 So.2d at 612).

[40] In other words, there was no superseding cause to break the causal chain. *See id.* at 98 (holding that there was no substantial-factor causation because of superseding causes—an intransigent owner and an incompetent gas company).

"medical matters" are "within common knowledge."[41] Few things could be more self-evident, more within the common knowledge, than that repeated head strikes could cause a fatal head injury.

On this record, then, Plaintiffs raised a fact dispute for their non-survivorship claims on whether the Individual Defendants caused Moore's death through excessive force. That is, again, except as for Mitchell for the same reasons Mitchell cannot be held liable for causing Moore's death when it comes to Plaintiffs' survivorship claims. Therefore, the district court did not erroneously grant summary judgment to Mitchell on this issue either.[42]

## C

The district court also concluded that Mitchell was entitled to qualified immunity. We disagree. We recently explained in *Sanchez v. Oliver* that employees of "private firm[s] systematically organized to perform the major administrative task of delivering healthcare services to inmates, detainees, and juveniles," like Mitchell, "[are] categorically ineligible to claim qualified immunity."[43] The district court did not have the benefit of

---

[41] *Lasha v. Olin Corp.*, 625 So.2d 1002, 1005 (La. 2002) (quoting PROSSER ON TORTS § 41 (5th ed. 1984)).

[42] The dissent would hold that Plaintiffs failed to raise a fact dispute on causation under *Bonin*. *Post* at 4. In its view, because "medical experts said only that each of the alleged acts 'possibly' caused Moore's injury," Plaintiffs cannot show that any single act of head trauma caused by an Individual Defendant was "more likely than not a 'substantial factor'" in causing Moore's death. *Post* at 4. We disagree. There's a difference between whether some act *could have* caused some result, and whether it *actually did*. Concurrent causation in Louisiana is squarely focused on the former since the latter may be impossible to know. *See Perkins*, 782 So.2d at 612. As we discussed above, Plaintiffs do not even need expert testimony for a reasonable jury to believe on this record that any individual head strike to Moore could have caused his subdural hematoma. Whether the experts equivocated, or not, on whether any individual head strike was *the* actual, fatal head strike simply does not matter for concurrent-causation purposes.

[43] 995 F.3d 461, 475 (5th Cir. 2021).

our decision in *Sanchez*. The parties now agree that Mitchell was not entitled to qualified immunity. Therefore, the district court incorrectly concluded that he was.

\*　　\*　　\*

In sum, Plaintiffs' claims against Individual Defendants should have *mostly* survived summary judgment. The record supports fact disputes over whether each Individual Defendant acted deliberately indifferent toward Moore. As for Plaintiffs' survivorship and non-survivorship claims, the record also supports fact disputes—save for against Mitchell—over whether each Individual Defendant's acts of excessive force caused Moore's death. *Finally*, the district court erred in holding that Mitchell was entitled to qualified immunity. Therefore, we AFFIRM the district court so far as it concluded that Mitchell did not cause Moore's death through excessive force, but otherwise REVERSE on the remaining issues Plaintiffs raise on their claims against the Individual Defendants.

## IV

Plaintiffs bring their remaining claims against the Corporate Defendants and the City. They contend that they've raised fact disputes over (A) the Corporate Defendants' vicarious liability for the Individual Defendants' actions, and (B) the Corporate Defendants' and City's direct liability under *Monell*. Plaintiffs haven't preserved their vicarious-liability argument for appeal, so we do not decide it. Still, they're right on *Monell*.

## A

We have, apparently, never squarely decided whether plaintiffs can hold *private* defendants vicariously liable under § 1983. Plaintiffs say they can. But the issue just isn't properly before us. The Corporate Defendants argued in their motion for summary judgment that our decision in *Baker v.*

*Putnal*[44] prevents Plaintiffs from holding them vicariously liable under § 1983. Plaintiffs chose not to respond to this argument in their opposition.[45] Rather, they argued only that they could hold the Corporate Defendants vicariously liable for their *state*-law claims for excessive force and failure to provide medical care. We do not consider arguments "raised for the first time on appeal."[46] Therefore, we leave for another day whether plaintiffs can hold private defendants vicariously liable under § 1983.

B

Still, Plaintiffs also contend that the Corporate Defendants and City are all *directly* liable under *Monell*. To prevail, Plaintiffs must show (1) "an official policy (or custom)," (2) that "a policy maker can be charged with actual or constructive knowledge," and (3) "a constitutional violation whose 'moving force' is that policy (or custom)."[47] The district court concluded that Plaintiffs could not raise a fact dispute under this test. We disagree.

(1)

Under *Monell*'s first element, Plaintiffs had to raise a fact dispute over whether an official policy or custom existed that led to a constitutional violation. [48] The Supreme Court has explained that a custom may give rise to liability under *Monell* if the practice is "so persistent and widespread as to practically have the force of law."[49] But, as Plaintiffs note, we have held that

---

[44] 75 F.3d 190 (5th Cir. 1996).

[45] Indeed, our decision in *Baker* features nowhere in their opposition.

[46] *Sindhi v. Raina*, 905 F.3d 327, 333 (5th Cir. 2018) (quoting *LeMaire v. La. Dep't of Transp. & Dev.*, 480 F.3d 383, 387 (5th Cir. 2007)).

[47] *Newbury v. City of Windcrest*, 991 F.3d 672, 680 (5th Cir. 2021).

[48] *See id.*

[49] *Connick v. Thompson*, 563 U.S. 51, 61 (2011).

plaintiffs need not provide "specific examples . . . to meet the 'condition or practice' element."[50] Plaintiffs contend they raised a fact dispute under this standard. They argue that a reasonable jury could conclude on this record that it was customary for guards to use the Four-Way to punish detainees out of view of cameras, and for chemical spray to be used to punish restrained prisoners. We agree.

Record evidence supports Plaintiffs' argument. Jackson worked at the Prison for three years. She averred that throughout her tenure the Four-Way had been used to "teach [prisoners] a lesson." Plaintiffs also note that an Assistant Warden "conceded that the Four-Way was used to interrogate detainees," and that "two Defendants here [have] testif[ied] under oath about their use of the camera-free Four-Way to interrogate and abuse five handcuffed detainees." And when it comes to the use of chemical spray as a punishment, Jackson also asserted that correctional officers did so "[o]n many occasions." Plus, say Plaintiffs, "[Defendant] Foster described guards as having gone into 'pepper spraying mode' against [a] detainee in the Four-Way," and two other Defendants "admitted under oath that they used chemical spray on five restrained detainees in the Four-Way."

This evidence suffices. A reasonable jury could conclude a custom existed to use the Four-Way and chemical spray to punish prisoners.[51]

---

[50] *Montano v. Orange Cnty.*, 842 F.3d 865, 876 (5th Cir. 2016).

[51] Because there's a fact dispute underlying an unconstitutional custom, we do not need to reach Plaintiffs' alternative, failure-to-train argument. *See Connick*, 131 S. Ct. at 1359–60 (explaining failure to train as an alternative theory for establishing an unconstitutional policy or custom under *Monell*).

No. 20-30739

(2)

Under *Monell*'s second element, Plaintiffs had to raise a fact dispute over whether a policymaker actually or constructively knew that the Four-Way and pepper spray were being used to punish prisoners.[52] "A policymaker," we have said, is "an official who has the power to make official policy on a particular issue."[53] "When he 'speak[s]' on it," in other words, "his words represent . . . official policy."[54] The parties do not dispute that the City delegated final policymaking authority for the prison to the Corporate Defendants, who then delegated it to Warden Hanson.[55] They do dispute, though, (a) whether Hanson knew about his guards' uses of the Four-Way and pepper spray, and (b) if he did know, whether the City can be held liable under *Monell* since Hanson exceeded the scope of his delegated authority. Even so, and for the reasons below, Plaintiffs have met their burden to raise a fact dispute on *Monell*'s second element.

*a.*

The parties dispute whether Hanson had actual or constructive knowledge about guards using the Four-Way and pepper spray to punish prisoners. On this record, though, a reasonable jury could conclude that Hanson had both.

---

[52] *See Newbury*, 991 F.3d at 680.

[53] *Arnone v. Cnty. of Dall. Cnty.*, 29 F.4th 262, 266 (5th Cir. 2022) (internal quotations omitted) (quoting *Jett v. Dall. Indep. Sch. Dist.*, 491 U.S. 701, 737 (1989)).

[54] *Id.* (quoting *Jett*, 491 U.S. at 737).

[55] *See Longoria ex rel. M.L. v. San Benito Indep. Consol. Sch. Dist.*, 942 F.3d 258, 271 (5th Cir. 2019) (explaining that *Monell* liability can extend to a City "when it delegates *policymaking* authority," but not "*decisionmaking* authority" (first emphasis added)).

*First*, Plaintiffs have raised a fact dispute over Hanson's actual knowledge. We have explained before that policymakers failing to take corrective action after their subordinates violate the constitution is some evidence that they know about an unconstitutional custom.[56] Here, some record evidence suggests that guards sprayed Moore with pepper spray and beat him in the Four-Way as punishment. And following Moore's death, Hanson took no disciplinary action against anyone involved. Therefore, a reasonable jury could find on this record that Hanson actually knew that guards used the Four-Way and pepper spray to punish prisoners.

*Second*, Plaintiffs have raised a fact dispute on Hanson's constructive knowledge. Constructive knowledge can be attributed to a policymaker "on the ground that [he] would have known of the violations if [he] had properly exercised its responsibilities, as, for example, where the violations were so persistent and widespread that they were the subject of prolonged public discussion."[57] Plaintiffs point to evidence of exactly that. Jackson testified that "by talking to other officers involved," she learned of a "wide spread [*sic*] practice" of taking prisoners into the Four-Way to "teach them a lesson"—i.e., to "punish" prisoners with force. "[M]any officers," she swore, "told her of this practice." Similarly, Jackson also testified that many guards told her that "they do what they want with prisoners," to include "routinely using chemical spray on prisoners for minor transgressions" as punishment—to include those "who are handcuffed." Jackson's testimony certainly supports widespread and persistent use of the Four-Way and

_____

[56] *See Grandstaff v. City of Borger*, 767 F.2d 161, 171 (5th Cir. 1985) ("If what the officers did and failed to do . . . was not acceptable to the police chief, changes would have been made."); *see also Bordanaro v. McLeod*, 871 F.2d 1151, 1167 (1st Cir. 1989) ("Post-event evidence can shed some light on what policies existed in the city on the date of an alleged deprivation of constitutional right.").

[57] *See Pineda v. City of Houston*, 291 F.3d 325, 330 (5th Cir. 2002).

pepper spray to punish prisoners, and that those customs were subject to prolonged public discussion among prison staff. Therefore, a reasonable jury could find on this record that Hanson constructively knew that guards used the Four-Way and pepper spray to punish prisoners.

### b.

Still, the City contends that it can't be liable since its delegation of authority expressly "prohibited the use of force to 'punish' an inmate." In other words, that Hanson had no authority to adopt an unconstitutional custom. But the City's argument is too clever by half. As Plaintiffs point out,

> [i]t is virtually always the case that, when an unwritten custom is challenged under *Monell*, that custom conflicts with some governing written policy or law. If a municipality condones an unlawful custom, it cannot avoid liability by claiming that it did not authorize its agents in writing to break the law in the course of their duties.

Exactly right. And we have rejected the City's very argument before. As we explained recently in *Arnone v. County of Dallas County*, what matters for attributing a policymaker's actions to a local government is not whether the complained of policy does or doesn't violate the law. "[W]hat matters is the precise 'function' that the policymaker is exercising"—i.e., are they setting policy for the *local government* or someone else?[58] And, here, it's undisputed that Hanson set policy for the City when it came to running the prison. Therefore, we cannot agree with the City that it is somehow shielded from *Monell* liability on this record.

---

[58] 29 F.4th 262, 271 (5th Cir. 2022).

No. 20-30739

(3)

Under *Monell*'s third element, Plaintiffs had to raise a fact dispute over whether the moving force of the deprivation that Moore endured was the policy or custom of using the Four-Way and pepper spray to punish prisoners.[59] And as we explained above, there's a fact dispute over whether Moore was beaten in the Four-Way and excessively pepper-sprayed—at least by Defendant Foster, if not by all the Individual Defendants. Therefore, we need not address this element further.

*        *        *

In short, Plaintiffs win on most, but not all their contentions about the Corporate Defendants' and City's liability. We do not decide if Plaintiffs can or cannot hold the Corporate Defendants vicariously liable for the Individual Defendants' actions. But Plaintiffs have raised fact disputes on the Corporate Defendants' and City's direct liability under *Monell*. Therefore, we reserve the vicarious-liability question, but REVERSE on *Monell* liability.[60]

---

[59] *See Pitrowski v. City of Houston*, 237 F.3d 567, 580 (5th Cir. 2001) ("[T]here must be a direct causal link between the municipal policy and the constitutional deprivation. *Monell* describes the high threshold of proof by stating that the policy must be the 'moving force' behind the violation." (quoting *Monell*, 436 U.S. at 694)).

[60] The dissent would hold that Plaintiffs have failed to raise a fact dispute on the Corporate Defendants' and City's direct liability. *See post* at 7. Again, though, we must make all justifiable inferences for the nonmovant Plaintiffs at this stage. *See Coleman*, 19 F.4th at 726. With those inferences made a reasonable jury could conclude on this record that the Corporate Defendants and City are directly liable under *Monell*.

No. 20-30739

V

Plaintiffs also contend that they raised fact disputes on punitive damages against the Corporate Defendants and all the Individual Defendants, except for Mitchell. The district disagreed and concluded that punitive damages under § 1983 aren't available against the Corporate Defendants as a matter of law. We agree with Plaintiffs.

A

To begin, the parties dispute whether the Corporate Defendants are immune from punitive damages under § 1983. The Corporate Defendants concede that private corporations typically are not immune. What they argue, though, is that private *prison-management companies* are. Why? Because private prison-management companies are "engaged in the performance of acts for the public benefit." The district court agreed with the Corporate Defendants. But we agree with Plaintiffs: Private companies may be held liable for punitive damages under § 1983 whether they performed acts for the public benefit or not.

The parties agree that the Supreme Court's decision in *City of Newport v. Fact Concerts, Inc.* governs this question.[61] There the Court faced a question of statutory interpretation: When Congress enacted § 1983, did it abolish common-law municipal immunity from punitive damages?[62] The Court answered *no*. The Court noted that it "consistently has declined to construe the general language of § 1983 as automatically abolishing such traditional immunities by implication."[63] What matters under § 1983,

---

[61] 453 U.S. 247, 262 (1981).

[62] *See id.* at 249, 258–59.

[63] *Id.* at 258 (citation omitted).

explained the Court, is whether (1) an immunity existed at common law when § 1983 was enacted, and (2) Congress intended to abrogate that immunity when it enacted § 1983.[64] Municipalities had "well established" immunity from punitive damages at common law, said the Court.[65] And nothing about § 1983 showed Congress intended to abrogate it.[66] Therefore, municipal immunity from punitive damages survived § 1983.

The Corporate Defendants, though, can't get past *City of Newport*'s first step. They cannot point to a well-established history of common-law immunity from punitive damages because it doesn't exist. Indeed, the Corporate Defendants do not point to a single case showing that *any* private corporation had a common-law immunity from punitive damages—whether it was "engaged in the performance of acts for the public benefit," or not.[67] That's likely why the Corporate Defendants argue that *City of Newport*'s first step "is not dispositive nor preclusive of a policy analysis." Still, "[a]s middle-management circuit judges, we cannot overrule the Supreme Court."[68] And whether it's a good idea to grant immunity from punitive damages to the Corporate Defendants is irrelevant. "Such a grant . . . should

---

[64] *See id.* at 259.

[65] *Id.* at 263.

[66] *See id.* at 265–66.

[67] In contrast, Plaintiffs point to plenty of caselaw and scholarship supporting that no such immunity existed. *See, e.g.*, *Smith v. Wade*, 461 U.S. 30, 35 (1983) (explaining that punitive damages exist as a remedy against individual defendants under § 1983); Barbara Kritchevsky, *Civil Rights Liability of Private Entities*, 26 Cardozo L. Rev. 35, 77, 77 n.293 (2004) ("Corporations were not immune from liability for punitive damages in 1871.").

[68] *Sims v. Griffin*, No. 21-40457, 2022 WL 1772258, at *3 n.17 (5th Cir. June 1, 2022) (quoting *Whole Woman's Health v. Paxton*, 978 F.3d 896, 920 (5th Cir. 2020) (Willett, J., dissenting), *rev'd en banc*, 10 F.4th 430 (5th Cir. 2021)).

be the product of a reasoned decision by the policymaking branch of our Government."[69] Not us.

The district court erred in concluding that the Corporate Defendants were immune from punitive damages. Nothing supports that they would have been immune at common law. We cannot create that immunity for them now.

B

To prevail on punitive damages, Plaintiffs must show that "the official conduct [was] 'motivated by evil intent' or demonstrate[d] 'reckless or callous indifference' to a person's constitutional rights."[70] Reckless or callous indifference "requires 'recklessness in its subjective form,' i.e. 'a "subjective consciousness" of a risk of injury or illegality and a "criminal indifference to civil obligations."'"[71] The district court concluded that Plaintiffs could not meet that standard—that they had "no facts" to support them. We disagree.

A reasonable jury could conclude on this record that Plaintiffs are entitled to punitive damages against Runner, Hardwell, Williams, and Curley. We explained above how the record could support a jury finding that each of these Defendants acted deliberately indifferent toward Moore's serious medical needs. Showing deliberate indifference requires showing a defendant was subjectively aware that "a substantial risk of serious harm"

---

[69] *Seminole Tribe of Fl. v. Florida*, 517 U.S. 44, 99 (1996) (Stevens, J., dissenting); *see also Erie R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938) ("There is no federal general common law.").

[70] *Sockwell v. Phelps*, 20 F.3d 187, 192 (5th Cir. 1994).

[71] *Williams v. Kaufman Cnty.*, 352 F.3d 994, 1015 (5th Cir. 2003) (quotations omitted).

existed and was indifferent to it.[72] Plaintiffs have therefore met their burden to raise a fact dispute over whether each of these Individual Defendants demonstrated reckless or callous indifference to Moore's constitutional rights.

A reasonable jury could also conclude on this record that Plaintiffs are entitled to punitive damages against the Corporate Defendants. We explained above how the record could support a jury finding that the Corporate Defendants' policymaker, Hanson, knew about widespread uses of excessive force in the prison—specifically, that guards used the Four-Way and pepper spray to physically punish prisoners. At a minimum, this raises a fact dispute over whether Hanson acted criminally indifferent toward illegal customs that exposed his prisoners to an unnecessary risk of injury.

*        *        *

In sum, Plaintiffs' claims for punitive damages should have survived summary judgment. The Corporate Defendants are not immune, and Plaintiffs have raised fact disputes over whether the Individual Defendants—save for Mitchell—and the Corporate Defendants—through their policymaker, Hanson—acted with reckless or callous indifference. Therefore, we REVERSE the district court's conclusions otherwise.

## VI

The record in this case is beyond troubling. But Plaintiffs still have a way to go. With fact disputes galore, it will take a jury to decide to what relief, if any, and against whom, if anyone, Plaintiffs are entitled.

AFFIRMED in part, REVERSED in part, and REMANDED for proceedings consistent with this opinion.

---

[72] *See Dyer*, 964 F.3d at 380.

James C. Ho, *Circuit Judge*, concurring in part and dissenting in part:

I'll begin with where the panel majority and I agree. I'm sure we agree that "[p]olice officers and prison guards sometimes must use physical force to enforce our laws and keep people safe." *Aucoin v. Cupil*, 958 F.3d 379, 380 (5th Cir. 2020). And we also agree that, "as with any use of government power, the law places important limits on the use of such force." *Id.* After all, "[p]eople are imperfect. And the greater the power, the greater our fear of abuse." *Id.*

"So when a prison inmate engages in willful misconduct, a prison guard may use reasonable force to restrain him—but after the inmate submits, there is no need, and thus no justification, for the further use of force." *Id.* "Being violently assaulted in prison is simply not part of the penalty that criminal offenders pay for their offenses against society." *Alvarez v. Akwitti*, 997 F.3d 211, 213 (5th Cir. 2021) (quotations omitted).

Our agreement also extends to many of the facts presented in this particular case—namely, that Plaintiffs have presented sufficient evidence that one or more defendants may have violated these principles by using excessive force in restraining Moore. Plaintiffs will be able to proceed on a number of their claims accordingly, as the district court has already held.

But as for the claims denied by the district court and presented by Plaintiffs in this appeal—Plaintiffs' survivorship and wrongful death claims arising out of Moore's death, their deliberate indifference claims, and their *Monell* claims—I agree with the district court that Plaintiffs have not carried

their burden.  The majority disagrees.  Accordingly, I respectfully dissent in part.[1]

## I.

Start with Plaintiffs' survivorship and wrongful death actions.  It's assumed for purposes of this appeal that (1) Moore engaged in physically threatening behavior that made it difficult in the extreme for prison guards to handle him; (2) one or more guards used excessive force in handling him; and (3) Moore later died from a subdural hematoma.  But Plaintiffs must also present evidence, sufficient to defeat summary judgment, showing *who* caused Moore's death.  And that's what's missing here.

Plaintiffs cannot survive summary judgment under standard principles of causation.  They attribute Moore's death to four possible acts, each carried out by one or more different defendants—there's (1) Officer Runner's punch inside the cell, (2) Officer Hardwell's body slam while removing Moore from the cell, (3) two officers accidentally dropping Moore while carrying him to the Four-Way, and (4) the alleged beating that occurred off-camera in the Four-Way.  Plaintiffs' experts speculate only that it was *possible* that one of these acts might have caused the fatal injury.  But they are unable to opine on which of these acts they think caused Moore's death.  And considering that one of these four acts (the accidental dropping) was entirely lawful, that means that Plaintiffs' experts are unable to conclude that Moore's death was in fact the result of unlawful conduct.

For example, when asked whether Hardwell's body slam caused the injury, one expert answered that "all I can say" is that it's "possible." Another expert testified that "I can't tell you what specific event caused

---

[1] I agree with the majority that Nurse Mitchell did not cause Moore's death through excessive force and thus concur in part.

[Moore's] subdural hematoma.  And, having practiced trauma surgery for thirty year[s], I don't think anybody could put their finger on that given at least evidence that I know of that exists."  Still another expert testified that he "can't offer a medical opinion as to what the specific trauma was that resulted in [Moore's] subdural hematoma."

In sum, Plaintiffs present no expert testimony or other evidence that would allow a fact finder to attribute Moore's fatal injury to the conduct of a specific defendant.  A jury would thus have no basis to conclude that any particular defendant unlawfully caused Moore's death.

The majority relies on two theories of concurrent causation:  the "function as a unit" theory from *Simpson v. Hines*, 903 F.2d 400 (5th Cir. 1990), and the "substantial factor" theory from *Bonin v. Ferrellgas, Inc.*, 877 So.2d 89 (La. 2004).  But neither of these theories work in light of the evidence available in the record of this case.

*Simpson* involved the collective use of excessive force by ten officers acting as a unit, resulting in the death of an inmate.  "[T]en officers entered Simpson's cell and collectively used physical force against him."  903 F.2d at 403.  One officer "put his arm around Simpson's neck while the other officers grabbed Simpson's arms and legs."  *Id.* at 402.  Then "[t]he officers forced Simpson to the floor and attempted to handcuff him while" one officer "sat on Simpson's chest."  *Id.*  Simpson never got back up, and he was found dead hours later.  *Id.*

So *Simpson* dealt with a single discrete event in which the defendants acted in unison.  This case, by contrast, involves several discrete events, separated by hours of time, and implicating different defendants. So *Simpson* does not apply to the facts presented here.  As *Simpson* itself makes clear, it would be "inapposite" to presume concurrent causation if the "plaintiffs

complained of several separate and discrete incidents of official malfeasance." *Id.* at 403.[2]

Nor does the substantial factor theory of causation recognized in *Bonin* apply here. Here's how *Bonin* describes this theory:

> Cause-in-fact is generally a "but for" inquiry, which tests whether the accident would or would not have occurred but for the defendant's substandard conduct. However, where there are concurrent causes of an accident, the proper inquiry is whether the conduct in question was a substantial factor in bringing about the accident. . . . In considering the substantial factor test, this Court has . . . considered "whether each of the multiple causes played so important a role in producing the result that responsibility should be imposed upon each item of conduct, even if it cannot be said definitively that the harm would not have occurred 'but for' each individual cause."

877 So.2d at 94 (citations omitted).

To succeed under this theory, then, "the plaintiff must prove by a preponderance of the evidence that the defendant's conduct was a substantial factor bringing about the complained of harm." *Perkins v. Entergy Corp.*, 782 So.2d 606, 612 (La. 2001).

Here, no rational jury could conclude by a preponderance of the evidence that any defendant's conduct was a "substantial factor" in bringing about Moore's death. The medical experts said only that each of the alleged acts "possibly" caused Moore's injury. That's a far cry from saying that the act was more likely than not a "substantial factor," *i.e.*, that the act "played

---

[2] To be sure, the majority holds that there's sufficient evidence that the individual defendants beat Moore in the Four-Way, which, if true, could theoretically support causation under *Simpson*. But there's not sufficient evidence that the individual defendants in this appeal were involved in the alleged beating. Badger's testimony named only Foster, and Foster is not a party to this appeal.

so important a role in producing the result that responsibility should be imposed." *Bonin*, 877 So.2d at 94 (quotations omitted).

Consider, by contrast, the case of *Horton v. Blackrock Aggregates, LLC*, 213 So.3d 429 (La. Ct. App. 2017). In *Horton*, a man was killed when a concrete wall collapsed on top of him. Three defendants contributed to the man's death: Langkop, BAC, and Baker. One expert testified that BAC's excavation near the wall "was the predominant cause of the wall's collapse." *Id.* at 439. The same expert also testified that Langkop's pressure-washing was "the final straw that caused the wall to collapse." *Id.* at 440. Another expert blamed Baker, testifying that the wall "had a strong probability of eventual collapse on the day it was built because it was not properly constructed" by Baker and thus "it would have eventually collapsed no matter what." *Id.*

So in *Horton*, the plaintiffs were able to prove by a preponderance of the evidence that each defendant's conduct was a "substantial factor" in bringing about the injury. Not so here. No expert testified that any defendant's conduct was the "predominant cause" of Moore's death or had a "strong probability" of causing the fatal injury. In fact, there's no evidence that any defendant was even a likely or presumed cause of Moore's death.

Rudimentary principles of causation foreclose liability in cases such as this. The district court was correct to grant summary judgment.

## II.

Next consider Plaintiffs' deliberate indifference claims. Most of the "facts" that the majority invokes to establish deliberate indifference cannot be found in the record.

For example, the majority claims that the individual defendants "all witnessed Moore strike his head on the prison's concrete floor repeatedly."

*Ante*, at 9.  But I don't see support for this claim in the record—it's not even clear from the videos when exactly Moore hit his head.  Of course, we must assume at summary judgment that Moore did in fact hit his head during one or more of the incidents captured on video.  But it's too much to assume that each defendant knew that, given how fast the events took place, and given that the defendants were not all in a position to even see whether Moore's head hit the ground.  It's also puzzling for the majority to suggest that the guards were deliberately indifferent to Moore's medical needs, given that those same guards observed the prison's nurse check on Moore several times.  In the majority's view, the guards could not rely on a medical professional's judgment that there was no significant risk to Moore's health.

Another example:  The majority claims that Nurse Mitchell "observed" guards getting "pretty rough" with Moore in the Four-Way— implying that Mitchell witnessed physical abuse.  *Ante*, at 9.  Curiously, the majority relies on Plaintiffs' *briefing* for this claim—not the record.  In his deposition, Mitchell explained that it was hard to secure Moore, because he was "agitated and irate and fighting."  Mitchell was then asked if he thought "it was strange that [Moore] was sleeping after having been so active with the officers."  Mitchell said no, because "[t]rying to get [Moore] under control was pretty rough."  So all Mitchell meant by "pretty rough" was that it was hard to secure Moore.  He wasn't suggesting that he witnessed physical abuse.

The majority also faults Mitchell for failing to provide medical care (1) after seeing the knot on Moore's forehead and (2) after Moore failed to wake from the sternum rub.  *Ante*, at 9.  But Plaintiffs' expert testified upon viewing a photograph of the knot that "there's nothing here that obviously indicates that there would be a severe underlying head injury."  And even assuming that Mitchell should have known that something was wrong after performing the sternum rub, "the failure to alleviate a significant risk that the

official should have perceived, but did not[,] is insufficient to show deliberate indifference." *Domino v. Texas Dep't of Crim. Just.*, 239 F.3d 752, 756 (5th Cir. 2001) (cleaned up). *See also Dyer v. Houston*, 964 F.3d 374, 381 (5th Cir. 2020) ("[D]eliberate indifference cannot be inferred merely from a negligent or even a grossly negligent response to a substantial risk of serious harm.") (quotations omitted); *Cleveland v. Bell*, 938 F.3d 672, 676 (5th Cir. 2019) ("[A]ctual knowledge is an essential element of Plaintiffs' burden.").

"Deliberate indifference is an *extremely* high standard to meet." *Domino*, 239 F.3d at 756 (emphasis added). The majority does not cite a single case that would allow a reasonable jury to find deliberate indifference here, and I have found none. Accordingly, the district court was once again correct to grant summary judgment.

## III.

The majority is also unable to point to record evidence sufficient to support liability against the corporate defendants and the city under *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978).

For example, to establish an unlawful custom, the majority claims that the prison guards unlawfully pepper sprayed inmates with such frequency that they even had a *name* for the practice—they called it "pepper spraying mode." *Ante*, at 3. But there is no record evidence to support this claim. The phrase "pepper spraying mode" comes from Badger's deposition. In that deposition, Badger merely relayed what Foster said to him: "[Foster] said they called him, and when he got there . . . they was in pepper spraying mode." There's no indication that this phrase was a name for a practice within the prison. Not even Plaintiffs suggest as much.

To take another example, the majority says that the assistant warden "admitted" that the Four-Way was used to "interrogate" prisoners. *Ante*, at 3. But he admitted no such thing. The word "interrogate" comes from

Plaintiffs' brief, not the assistant warden's deposition.  In his deposition, the assistant warden said only that he and guards sometimes *talked* to inmates in the Four-Way.  He specifically denied any practice of bringing inmates to the Four-Way, much less a practice of bringing them there for the purpose of interrogation or physical abuse.

The majority also tries to establish the existence of an unlawful custom by pointing to (1) Yolanda Jackson's vague and conclusory testimony and (2) an admission by two guards to having pepper sprayed inmates in the Four-Way a year after Moore's death (the majority cites this confession twice).  The majority then simply declares, without citing a single case: "This evidence suffices."  *Ante*, at 22.

But established precedent imposes a far higher bar for liability under *Monell* than that.  A custom may give rise to liability under *Monell* only if the unlawful practice is "so persistent and widespread as to practically have the force of law."  *Connick v. Thompson*, 563 U.S. 51, 61 (2011).  The pattern of behavior "must have occurred for so long or so frequently that the course of conduct warrants the attribution to the governing body of knowledge that the objectionable conduct is the expected, accepted practice of . . . employees."  *Davidson v. City of Stafford*, 848 F.3d 384, 396 (5th Cir. 2017) (quotations omitted).  A pattern thus requires "similarity, specificity, and sufficiently numerous prior incidents."  *Id.*  "Showing a pervasive pattern is a heavy burden."  *Sanchez v. Young Cnty.*, 956 F.3d 785, 793 (5th Cir. 2020).

The majority nowhere acknowledges this heavy burden.  *See, e.g.*, *Fraire v. City of Arlington*, 957 F.2d 1268, 1278 (5th Cir. 1992) (to prevail under *Monell*, "[w]e have consistently required a plaintiff to plead specific facts, not merely conclusory allegations") (quotations omitted); *Peterson v. City of Fort Worth*, 588 F.3d 838, 851 n.4 (5th Cir. 2009) (finding no pattern

even though there were 27 complaints of excessive force over four years against police officers).

* * *

In this appeal from the grant of summary judgment, we construe the evidence in Plaintiffs' favor.  But that doesn't give us license to prop up Plaintiffs' case with evidence that doesn't exist—or to treat Plaintiffs' briefing as if it were the record.  Nor does it license us to make legal pronouncements contrary to our precedent.  I respectfully dissent in part.